2013 CO 68

**The PEOPLE of the State of Colorado, Plaintiff-Appellant.**

v.

**Jasim Mohammed Hassi RAMADON, Defendant-Appellee.**

**Supreme Court Case No. 13SA22**

Supreme Court of Colorado.

December 9, 2013

Attorneys for Plaintiff-Appellant: Daniel H. May, District Attorney, Fourth Judicial District, Kelson Castain, Deputy District Attorney, Colorado Springs, Colorado.

Attorney for Defendant-Appellee: Douglas K. Wilson, Public Defender, Molly Hostetler, Deputy State Public Defender, Colorado Springs, Colorado.

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 The prosecution brings this interlocutory appeal challenging the El Paso County District Court's suppression of Jasim Ramadon's statements obtained from a custodial interrogation at the Colorado Springs police station.

¶ 2 Ramadon is a native of Iraq who the United States military brought to this country for his protection as a teenager. He was brought here after members of his immediate family were killed because of his aid to the United States during the Iraq war. During the war, known in the United States as Operation Iraqi Freedom, he acted as an interpreter and informant for the military. In 2012, the Colorado Springs police brought Ramadon—who, for his protection, often used the name Jay Hendrex—to the police station as part of a sexual assault investigation. The police had information identifying Ramadon as one of the perpetrators in the sexual assault. The trial court found and concluded, under the totality of the circumstances, that all of Ramadon's statements after minute forty-two of the interrogation tape were impermissibly coerced and involuntary.

¶ 3 After viewing the videotape of the interrogation, we uphold the trial court's suppression order starting at minute fifty-four, instead of minute forty-two, when the interrogating officer told Ramadon that, if he did not tell the truth, he would likely be deported to Iraq. The record supports the trial court's conclusion that coercive police conduct during the custodial interrogation starting at the fifty-four minute mark played a significant role in inducing Ramadon's inculpatory statements.

I.

¶ 4 On July 27, 2012, pursuant to a warrant, the Colorado Springs police arrested Ramadon in connection with a July 22, 2012, sexual assault on a woman. Officers took Ramadon to the police station to be interviewed by Detective James Allen: it is undisputed that Ramadon was in custody at this time. Allen interviewed Ramadon twice, and Ramadon also met twice with polygrapher Robert Armstrong, although he ultimately declined to take a polygraph.

¶ 5 We have reviewed the videotaped interview of Allen's interrogation of Ramadon. At 10:52 a.m., the start of the interview recording, Ramadon sat alone in an interview room dressed in shorts and a tank top. When Allen appeared fifteen minutes later, Ramadon immediately asked for a shirt and told him he was cold. Allen brought him an orange inmate top for him to wear during the interview. Ramadon appeared tired and

yawned throughout the interview. Ramadon told Allen that his wife had a court appearance at 1:30 p.m. and asked if he would be able to make it, to which Allen responded, "We probably won't be talking that long.... We should be alright man, I wouldn't worry about that." Ramadon then asked to make a phone call, and Allen told him he would be able to "in a minute," but Ramadon was never allowed to make a call.

¶ 6 At the outset of the interview, Allen did not tell Ramadon that he was under arrest or confirm that there was a warrant for Ramadon's arrest. Instead, he told Ramadon that, if Ramadon did not want to talk to him, he was free to leave, even though the circumstances demonstrated that Ramadon was under arrest and not free to leave. Ramadon explained that he was twenty years old, had just graduated from high school, and was born in Iraq. Ramadon told Allen that he worked for the United States military in Iraq. He explained that in 2004, the military brought him back to the United States for his safety. During these initial exchanges, both Allen and Ramadon were cordial and the tone was conversational.

¶ 7 After Allen gave Ramadon a *Miranda* advisement, he asked Ramadon what he knew about the assault. Ramadon told Allen a story about being very drunk and in fights throughout the night. After passing out at his friends' apartment, he went downstairs and tried to go home, but he saw a woman lying on the ground, bleeding. Ramadon told Allen that he helped the woman to what he thought was her apartment and pleaded several times for the man inside the apartment to call the police. Ramadon repeated the same story when Allen reframed the question later, telling him that the first time he saw the woman was outside on the ground.

¶ 8 Nearly thirty-two minutes into the interrogation, Allen engaged Ramadon about his background in Iraq, telling Ramadon that he spent time in Iraq during the war as well. Ramadon responded that the Iraqi military had killed his entire family, and he said that his involvement with the United States military was well known, noting there was a book telling his story and that he was going to meet with another author that day about helping with another book.[1] Allen continued, "Yeah, I know, it's a bad place over there. I've lost two of my interpreters over there." Ramadon nodded, saying that he lost a lot of his American friends and saying how sad it was. The interview continued and Ramadon gave the same account he previously had given regarding the woman he saw on the ground outside his friends' apartment.

¶ 9 At forty-two minutes into the interview, Allen told Ramadon:

> All I want is for you to be honest with me.... I'm not here to try to get you in trouble, I'm not here to make up stuff or do anything like that.... You've done some honorable stuff.... [T]he last thing I want to do is come here and ruin all of your plans, dreams, hopes, whatever.... But I need you to be honest with me.... Because if you lie ... and I find out later, I'm gonna arrest you.

Ramadon maintained his story and asked for Allen's card so that he could contact him if he remembered any other details later, suggesting that with some rest he might remember more. As the trial court found, this indicated that Ramadon "believe[d] he [would] be going home."

---

1. Between minutes eighteen and thirty-three of the interrogation, Ramadon explained to Allen that he turned himself over to the United States military for his safety when he was a teenager in Iraq. He said, "Because I was working for the military in Iraq,... all my family got killed. They brought me here, so I've been all over TV and media.... They didn't want me to get hurt, so they gave me [Jay Hendrex as my] name." First Sergeant Daniel Hendrex, and other American soldiers, worked to bring Ramadon back to the United States after his family was killed. First Sergeant Hendrex, from Colorado Springs, took Ramadon under his care when Ramadon first moved to the United States. Ramadon also explained that he has a fake birthday as part of his identity here in the United States. Ramadon told Allen, "I came [to the United States] in 2004. It was on the internet. It was like all over the internet.... It's still. There was a book. I'm writing another book actually. There's another author. I'm supposed to have a meeting today with him again to talk [about my experiences]. [He is] a ghost writer." First Sergeant Hendrex wrote the first book about Ramadon' s story, which is called *A Soldier's Promise* (2009).

¶ 10 At forty-four minutes into the interview, Allen asked Ramadon about the injuries he sustained in Iraq, and Allen supplied his own observations about "being blown up over there":

> I understand. I've been injured too. I was injured over there, an IED. Okay, and I don't really use that as an excuse, and no one even knows. But, I've been blown up over there. I've been hit with RPG, all kinds of stuff, not good. So I understand where you are coming from, and like I said, that's all honorable service.

¶ 11 Allen's tone then shifted and started to become more accusatory. He confronted Ramadon, stating that he had talked to his friends who placed Ramadon at the scene of the assault. Allen also said that he needed Ramadon to be honest with him, saying "[I'm giving you] one more opportunity to be completely honest with me, then I'm going to tell you what I know." Allen went on to say, "I'm going to bring some stuff in and show you [what happened]. And it is you, beyond a doubt it is you. [Pointing at Ramadon.] All this stuff you want to do, being a police officer and going to college, it's all about to go away, right now." At forty-eight minutes, Allen told Ramadon that he knew from Ramadon's friends that he was in the apartment with the victim and the other suspects. Ramadon conceded the point, claiming he could not remember what happened because he was drunk, but he was adamant about not touching the woman other than to help her home.

¶ 12 From fifty to fifty-four minutes into the interview, Allen invoked the violent circumstances that triggered the United States military's removal of Ramadon from Iraq after his family was killed. Allen confronted Ramadon with a sheet of paper showing his photo with text underneath, accused Ramadon of committing the rape, and insinuated that Ramadon would not be jailed if he revealed the circumstances of the sexual assault:

> Allen: I'm worried about this guy right here. This is who I'm worried about. This guy right here. [Allen held up a sheet of paper to show Ramadon.] Okay? Do you know who that is?
>
> Ramadon: Uh yeah, that's me.
>
> Allen: That's you.
>
> Ramadon: Yeah.
>
> Allen: That's who I'm worried about. This guy right here. Jay. And this is your full name. I understand that. I know this date of birth, and I know your other date of birth. I know everything about you. I've already talked to some people that have worked with you. . . . And I'm not a dummy. I've got connections in both law enforcement and the military world. Okay? Even right now.
>
> Ramadon: Okay.
>
> Allen: So I know all this about you even before you told me.
>
> Ramadon: Okay.
>
> Allen: This Hendrex, I already know this stuff about you. [Allen points directly at Ramadon.]

At fifty-three minutes, immediately following this exchange between Allen and Ramadon, Ramadon started to change his story, stating that two of the men in the apartment sexually assaulted a woman—although he did not say if it was the same woman he helped home. He said that "a bunch of stuff [was] going on," but he did not remember the incident well because he was drunk.

¶ 13 Critical to our determination that there was improper coercion at fifty-four minutes into the interview, Allen invoked the risk of violence and death Ramadon would face if deported from the United States. Further, Allen used the likely loss of his wife and daughter if he did not supply details of the sexual assault. Allen said, "You need to realize, you need to tell me the truth. Because everything, even you being here, even you being in this country, right now, is in jeopardy." Ramadon responded, "I know that! My daughter, everything. But, I swear to you man, that's all I can remember." The rest of the interrogation after the fifty-four minute point produced a raft of incriminating statements placing Ramadon in the apartment while the sexual assault occurred and demonstrating that Ramadon took the woman back to her apartment after the assault at the behest of his friends.

¶ 14 Allen continued to repeatedly tell Ramadon that he would be jailed if he did not admit to sexually assaulting the woman. Allen followed through with his threat to jail Ramadon. He told Ramadon, "Okay, that's it. You're done. You're going to jail. You're going to jail today. You're not going anywhere." Ramadon was handcuffed by another officer and taken to a detention cell. After twenty minutes in the detention cell, Ramadon requested to speak with Allen again. While releasing his handcuffs, the officer who transported Ramadon to the interview room stated:

> You know Jay, I think you're a good guy. Do the right thing to save yourself some time, okay? ... Don't lie to him anymore because the judge is going to hate you forever.... The more you keep telling them bullshit, the more years the judge is going to tack onto you.

¶ 15 While continuing to maintain that he did not assault the woman, Ramadon told Allen that he knew who did. He said that he did not tell Allen the truth at the beginning because his friends told him the previous day that, "[I]f you tell [the truth] we [are] going to die." According to Ramadon, he was at his friends' apartment, there was talk about having sex with a woman, one of his friends gave the victim a drink that incapacitated her, another forced his penis into the woman's mouth, and a third inserted his hand into the victim's rectum, causing severe bleeding. Ramadon denied touching the woman and told Allen he tried to get the other men to stop, but one of the men beat him up. When the assault ended, his friends told Ramadon to walk the woman back to her apartment because the neighbors would not recognize him. Ramadon complied with his friends' request and transported the woman back to her apartment to shield his friends from scrutiny. He maintained that he tried to get the occupant of the apartment, who he thought was the woman's husband, to call police. Allen told Ramadon that he appreciated him being honest and that he "was saving [him]self" by telling the truth. Ramadon was upset while describing the incident and cried when he talked about the possibility of being deported to Iraq. Ramadon and Allen then engaged in the following colloquy:

*Ramadon:* I have a daughter. I'm going to get deported if this happens.

*Allen:* Absolutely, you're going to go right back to Iraq. That's what's going to happen.

*Ramadon:* Then I'm dead, and where is my daughter going to be without a father?

*Allen:* Yeah. [Nodding.]

The interrogation continued but ended when Ramadon asked for a lawyer.

¶ 16 Ramadon moved to suppress statements he made during the custodial interrogation as involuntary. The trial court considered the voluntariness of Ramadon's statements under the totality of the circumstances and concluded they were involuntary after the forty-two minute mark of the interview. The prosecution appeals the trial court's ruling under C.A.R. 4.1.

## II.

¶ 17 The record supports the trial court's conclusion that police conduct during the custodial interrogation played a significant role in inducing incriminatory statements Ramadon made starting at minute fifty-four. Accordingly, we affirm the suppression order in part, reverse in part, and return this case to the trial court for further proceedings consistent with this opinion.

### A. Standard of Review

¶ 18 Under the due process clauses of the United States and Colorado constitutions, a defendant's statements must be voluntary to be admissible as evidence. *Effland v. People,* 240 P.3d 868, 877 (Colo. 2010); U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25. Governments, state and federal, are constitutionally compelled to establish guilt by evidence independently and freely secured and may not prove a charge against an accused by coercion. *People v. Medina,* 25 P.3d 1216, 1221–22 (Colo. 2001) (citing *Malloy v. Hogan,* 378 U.S. 1, 8–9, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). States are prohibited from compelling a person to admit the commission of a crime or provide inculpatory statements through inducements that fall far short of torture. *Id.* at 1222. The

due process clauses require the exclusion of involuntary statements well before those that constitute true and complete confessions. All evidence, including inculpatory statements, must be independently and freely secured without resorting to the use of coercion.

¶ 19 In a suppression hearing, when a defendant makes a prima facie evidentiary showing of involuntariness, the prosecution bears the burden by a preponderance of the evidence of establishing that the statements were voluntary. *See People v. Raffaelli*, 647 P.2d 230, 235 (Colo. 1982). To be voluntary, a statement must be the product of an essentially free and unconstrained choice by its maker. *Id.* at 234. The statement must not be the product of any direct or implied promises, nor obtained by exerting improper influence. *Medina*, 25 P.3d at 1222; *see also Arizona v. Fulminante*, 499 U.S. 279, 287, 302, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (affirming suppression of statements made as a result of an implied promise of protection from physical violence). Coercive physical or psychological conduct by the government renders an otherwise voluntary statement involuntary if the conduct plays a significant role in inducing the statement. *Medina*, 25 P.3d at 1222; *see also Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'"). Coercive conduct includes not only physical abuse or threats directed against a person, but also subtle forms of psychological coercion. *People v. Gennings*, 808 P.2d 839, 843–44 (Colo. 1991). The deliberate exploitation of a person's weakness by psychological intimidation can, under some circumstances, constitute a form of governmental coercion that renders a statement involuntary. *Id.* at 844.

¶ 20 The focus of the voluntariness inquiry is whether the behavior of the official was such as to overbear the defendant's will to resist and bring about an admission or inculpatory statement not freely self-determined. *Effland*, 240 P.3d at 877. The voluntariness doctrine requires a two-step inquiry. First, the police conduct must

have been coercive. *Connelly*, 479 U.S. at 167, 107 S.Ct. 515. Second, the coercive police conduct must have played a significant role in inducing the statements. *Medina*, 25 P.3d at 1222–23. These questions must be answered with complete disregard of whether the defendant, in fact, spoke the truth. *Effland*, 240 P.3d at 877. Courts determine voluntariness of the statements by considering the totality of the circumstances under which the statements were given, looking at the significant details surrounding and inhering in the interrogation under consideration. *Gennings*, 808 P.2d at 844. Courts look at both the defendant's ability to resist coercive pressures and the nature of the police conduct, using a nonexclusive list of factors when making a voluntariness determination:

(1) whether the defendant was in custody;

(2) whether the defendant was free to leave;

(3) whether the defendant was aware of the situation;

(4) whether the police read *Miranda* rights to the defendant;

(5) whether the defendant understood and waived *Miranda* rights;

(6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

(7) whether the statement was made during the interrogation or volunteered later;

(8) whether the police threatened [the] defendant or promised anything directly or impliedly;

(9) the method or style of the interrogation;

(10) the defendant's mental and physical condition just prior to the interrogation;

(11) the length of the interrogation;

(12) the location of the interrogation; and

(13) the physical conditions of the location where the interrogation occurred.

*Medina*, 25 P.3d at 1222–23. Whether the defendant was given *Miranda* warnings is but one of the factors this court considers, and statements may still be considered involuntary despite a proper *Miranda* advisement. *Raffaelli*, 647 P.2d at 235 ("The fact that *Miranda* warnings precede a challenged

confession does not insulate that confession from an inquiry into whether it was voluntarily given."). Courts should "consider the significant details surrounding or inhering in the interrogation" and examine whether the police conduct created an atmosphere of unconstitutional coercion such that the conduct "plays a significant role in inducing the statement." [2] *Medina*, 25 P.3d at 1222 (internal quotations omitted).

¶ 21 A trial court's suppression ruling presents a mixed question of fact and law. *Medina*, 25 P.3d at 1223. We defer to the trial court's findings of historical fact and will not overturn those findings if they are supported by competent evidence in the record. *People v. Guthrie*, 2012 CO 59, ¶ 10, 286 P.3d 530, 533. However, we review the legal effect of facts de novo. *People v. Valdez*, 969 P.2d 208, 211 (Colo. 1998). Moreover, a trial court's ultimate legal conclusion that is inconsistent with or unsupported by evidentiary findings is subject to correction by this court. *Gennings*, 808 P.2d at 844. When the interrogation is audio or video-recorded, and there are no disputed facts outside the recording pertinent to the suppression issue, we are in the same position as the trial court in determining whether the statements should or should not be suppressed under the totality of the circumstances. *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008); *People v. Lynn*, 278 P.3d 365, 368 (Colo. 2012). If we conclude that a defendant's statements were made involuntarily, they must be suppressed.

¶ 22 When coercion produces a series of statements, a court need not parse and dissect them to determine which statements may or may not be inculpatory. Instead, the entire interrogation that follows the point at which the police conduct becomes coercive under the totality of the circumstances must be suppressed in its entirety. They may not be used either as substantive evidence or for impeachment purposes. *People v. Jensen*, 747 P.2d 1247, 1251–52 (Colo. 1987); *See also* Colo. Prac. Series § 13.41 (2013) ("A statement that is deemed involuntary, even one made after advisement of *Miranda* rights, is inadmissible for *any* purpose.").

## B. Ramadon's Statements

¶ 23 In granting Ramadon's motion, the trial court suppressed all of Ramadon's statements after forty-two minutes into the interview when Allen told Ramadon that he was "not here to try and get [him] in trouble." The court found that this exchange began a series of implied promises of leniency, threats of imprisonment, and threats regarding deportation and separation from his family, all designed to induce inculpatory statements from Ramadon. Specifically, the trial court found six of Allen's statements to be direct and implied threats and promises:

(1) "I'm not here to try and get you in trouble or anything like that";

(2) "You need to realize that you need to tell me the truth because even you being in this country is in jeopardy";

(3) "If you come out and come clean with me and take accountability for what you did, it's not going to be nearly as bad because as of right now, you're going to court and I'm going to take you to jail right now if you don't tell me exactly what happened";

(4) "If you don't tell me the truth of what happened, then you're getting locked up";

(5) "Do you want your girl to come visit you in jail? Do you want your wife and daughter to come visit you in jail?"; and

2. It is well settled that a constitutional due process violation can only occur by way of a state actor. *Connelly*, 479 U.S. at 164, 107 S.Ct. 515 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."). In *Medina*, we discussed causation for the purpose of establishing that a state actor must be involved to find that there was a due process violation. *Id.* ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any *state actor* has deprived a criminal defendant of due process of law.") (emphasis added) (citing *Connelly*, 479 U.S. at 164, 107 S.Ct. 515). *Medina* does not stand for the proposition that there must be a direct causal link between a specific instance of police conduct and a specific admission by a defendant. Instead, *Medina* adopted the same totality of the circumstances test we apply here. *Id.*

(6) Telling the Defendant that he's going to jail when the Defendant says he does not want to talk about it.

¶ 24 The trial court also determined that Allen built trust with Ramadon based on his own experiences in Iraq and then used that knowledge against Ramadon to imply that if Ramadon did not cooperate with him, Ramadon would be deported to Iraq where his life would be in danger. Because Ramadon was concerned during the interviews about being sent back to Iraq, the trial court found that Allen's repeated discussion about Iraq was an implied threat about what would happen if Ramadon was deported.

¶ 25 In our review of the record in this case, considering the totality of the circumstances and the relevant factors, we conclude that Allen's conduct between the fifty and fifty-four minute mark was coercive and played a significant role in inducing Ramadon's inculpatory statements after minute fifty-four, rendering the subsequent interrogation questions and answers suppressible in their entirety as involuntary. Despite Ramadon repeatedly insisting early in the interview that he was telling the truth, Allen— between the fifty and fifty-four minute mark—employed coercive tactics designed to frighten Ramadon into revealing the circumstances of the sexual assault. Allen confronted Ramadon with a sheet of paper containing Ramadon' s photo and engaged in accusatory questioning calculated to trigger Ramadon' s fear of being deported to Iraq and killed there. This exchange culminated at minute fifty-four when Allen stated, "You need to realize, you need to tell me the truth. Because everything, even you being here, even you being in this country, right now, is in jeopardy." Due to the previous death of family members in Iraq stemming from his informant status with the United States military, Ramadon was vulnerable to Allen's tactics. As we have stated before, "the deliberate exploitation of a person's weaknesses by psychological intimidation" can render statements involuntary. *Medina*, 25 P.3d at 1225. Although the prospect of being deported, viewed in a vacuum, may not have been enough to render Ramadon's statements involuntary, when viewed under the totality of the circumstances, the possibility of deportation was a uniquely terrifying prospect for Ramadon. Ramadon was brought to the United States for his safety after members of his family were killed by the Iraqi military. The fact that Allen knew and used this information in his interrogation amplified Allen's threats to a level of coercion.

¶ 26 Notably, advising a defendant of immigration consequences alone would likely not demonstrate coercion absent other evidence demonstrating involuntariness under the totality of the circumstances. The purpose of the test is to examine the tactics used by the police given the situation, the defendant's vulnerability, and other attendant circumstances. However, under the totality of the circumstances in this case, the invocation of deportation was coercive. Allen's purpose was not to provide legal advice to Ramadon, but to threaten Ramadon into making inculpatory statements.

¶ 27 We disagree with the trial court's determination that Ramadon's statements must be suppressed in their entirety after minute forty-two. Our examination of the videotape reveals that Ramadon began to change his story between minutes forty-two and fifty-four, but these statements were not coerced and are admissible. They resulted from the interrogator's technique of ingratiating himself with Ramadon. While the tone of the interrogation was becoming more accusatory, the police conduct during that time period did not cross the line into coercion.

¶ 28 Viewing the videotape between minute fifty and fifty-four reveals that the interrogator markedly switched his tactics. He repeatedly pointed his finger at Ramadon, held up a sheet of paper with Ramadon's photograph on it, told Ramadon he knew from military sources all about the death of Ramadon's family in Iraq, threatened Ramadon with deportation that would likely lead to Ramadon's death, and insinuated that Ramadon would not be deported if he admitted to committing the sexual assault. The interrogator's invocation of violence renders all statements Ramadon made after minute fifty-four involuntary and inadmissible. Whether or not Ramadon made incriminating statements prior to minute fifty-four does not

affect our conclusion that the entirety of Ramadon's statement after the fifty-four minute point was coerced, contained incriminating information, and was involuntary under the totality of the circumstances.

¶ 29 Examples of inculpatory statements and evidence that followed the fifty-four minute mark include: (1) that he had lied to Allen by changing his story; (2) that he was in the apartment with men who had discussed having sex with the victim; (3) that the victim was given a drugged drink; (4) that Ramadon was present throughout the sexual assault; and (5) that Ramadon transported the victim back to her apartment after the sexual assault. These statements, at the very least, would provide evidence that Ramadon was an accomplice to the crime, even if Ramadon did not personally admit to assaulting the woman. *See* § 18–1–603, C.R.S. (2013) ("A person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense."). Ramadon stated that he took the woman back to her apartment after the other men asked him to do so, shielding the others from scrutiny as they expected that no one would recognize Ramadon.

## C. Conclusion

¶ 30 In sum, the trial court's conclusion of involuntariness, based on the totality of circumstances, was justified as to all statements Ramadon made after the fifty-four minute mark.

## III.

¶ 31 Accordingly, we affirm the suppression order in part, reverse in part, and return this case to the trial court for further proceedings consistent with this opinion.

JUSTICE EID dissents, and JUSTICE COATS and JUSTICE RICE join the dissent.

EID, J., dissenting

¶ 32 The majority holds that the defendant's statements were rendered involuntary because the detective threatened that "if [the defendant] did not tell the truth, he would likely be deported to Iraq." Maj. op. ¶ 3. I disagree. First, the detective's actual statement—that "even you being in this country is in jeopardy"—was not a threat, as the majority seems to think; instead, it was an entirely truthful description of the seriousness of the defendant's situation. Second, the majority inappropriately assumes the role of factfinder, making voluminous factual findings drawn from its own review of the video of the interview. Maj. op. ¶¶ 5–15. But even then, the majority gets the facts wrong, erroneously concluding that the detective's statement overbore the defendant's will even though the defendant changed his story and incriminated himself *before* the detective's statement, not *after*. Therefore, the detective's statement could not possibly have "over[borne] [the defendant's] will to resist" and thus did not "bring about [a] confessio[n] not freely self-determined." *Effland v. People*, 240 P.3d 868, 877 (Colo.2010). Because I would find the defendant's statements were not the product of police coercion, I respectfully dissent.

¶ 33 We have repeatedly held that a defendant's statement is voluntary unless coercive behavior on the part of the police "overbear[s] the defendant's will to resist and bring[s] about a confession not freely self-determined." *People v. Klinck*, 259 P.3d 489, 495 (Colo.2011); *accord. Effland*, 240 P.3d at 877. Ultimately, "the question at issue is whether the individual's will has been overborne" by coercive conduct. *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998); *People v. Theander*, 295 P.3d 960, 969, 2013 CO 15, ¶ 39 (Colo.2013). Such conduct "must play such a significant role in inducing the defendant's confession as to render the confession constitutionally invalid." *People v. Gennings*, 808 P.2d 839, 843, 846 (Colo.1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)); *see also Effland*, 240 P.3d at 877; *Klinck*, 259 P.3d at 495; *Valdez*, 969 P.2d at 211–12; *Theander*, 295 P.3d at 969. In sum, without

coercive police conduct "causally related to a confession," there is no basis for concluding that a statement is involuntary. *People v. Medina,* 25 P.3d 1216, 1222 (Colo.2001).

¶ 34 In this case, the majority mistakenly finds that the detective's statement was coercive, and then compounds that mistake by erroneously concluding that the statement overbore the defendant's will.

¶ 35 As an initial matter, the detective's statement that "even you being in this country is in jeopardy" was an entirely truthful assessment of the seriousness of the defendant's situation. A defendant convicted of an aggravated felony, as defined by federal law, may face removal. 8 U.S.C. § 1227(a)(2)(A)(iii) (2012); *see also* 8 U.S.C. § 1101(a)(43)(A) (2012) (categorizing rape, whether committed in violation of federal or state law, as an aggravated felony); § 1101(a)(43)(F) (categorizing a crime of violence punishable by at least one year in prison as an aggravated felony); 18 U.S.C. § 16(b) (2012) (defining crime of violence as any felony "that, by its nature, involves a substantial risk that physical force ... may be used"); § 18–3–402(5)(a), C.R.S. (2013) (categorizing sexual assault as a class 2 felony if the defendant was aided by another or if the victim suffers serious bodily injury); § 18–1.3–410(1)(a)(I), C.R.S. (2013) (dictating a presumptive range of eight to twelve years of imprisonment for class 2 felonies). Cf. *Padilla v. Kentucky,* 559 U.S. 356, 368, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) (stating that the immigration provisions providing for removal for a controlled substance conviction are "succinct, clear, and explicit"). Indeed, the U.S. Supreme Court has held that a defense counsel's performance is deficient if she fails to inform her client of the possible removal consequences of a conviction. *Id.* at 368–69, 130 S.Ct. 1473. Moreover, the detective's statement was an assessment with which the defendant agreed, as shown by the fact that he responded, "I know that! My daughter, everything." Maj. op. ¶ 13. It is difficult to see how the detective's truthful assessment of the defendant's situation—an assessment required of an attorney by U.S. Supreme Court caselaw, and one with which

the defendant himself agreed—could be deemed coercive.

¶ 36 The majority concludes that the detective's statement was designed "to threaten [the defendant] into making inculpatory statements." Maj. op. ¶ 26. But as the majority acknowledges, this interpretation suggests that the detective "insinuate[s] that [the defendant] [would] not be deported if he admit[ted] committing the sexual assault," id. at ¶ 28—in other words, that he would be allowed to remain in the country if he implicated himself with regard to an extremely severe crime. There is no reason to read into the detective's statement such a highly unlikely connotation. Instead, as noted above, the detective was simply stating an obvious truth—that the defendant was in a serious situation that could have serious consequences, as the defendant himself acknowledged.

¶ 37 But the majority makes a more fundamental mistake by concluding that the detective's statement overbore the defendant's will. The trial court found that once questioning had become "accusatory" at minute 42 of the first interview, the defendant's statements became involuntary. *See* Order at 8. The majority reverses the trial court's conclusion, but then makes its own determination that the defendant's statements became involuntary at minute 54, when the detective told the defendant that "even you being in this country is in jeopardy." Maj. op. ¶ 29 (suppressing statements from minute 54); *id.* at ¶ 31 (affirming the trial court's suppression order in part and reversing it in part). It goes on to rely on its own factfinding to conclude that the statement "played a significant role in inducing [the defendant's] inculpatory statements." *Id.* at ¶ 25. But the majority fails to analyze what the defendant was saying—or, more importantly, what he had already said—at this point in the interview. It thus fails to acknowledge that the defendant changed his story *before,* not *after,* the detective's statement. In sum, the detective's statement could not be "causally related to a confession." *Medina,* 25 P.3d at 1222.

¶ 38 As the record shows, the defendant initially told the detective that he had found

the victim on the ground below his friends' apartment and helped her home, and that he had no contact with the victim before that time. Maj. op. ¶ 7. At minute 48:50, he continued to maintain this story, but said, "if [his friends] say I was there [in the apartment] ... I was there that night then." At minute 52:17, he said, "I didn't do anything. I remember [one friend] putting his [penis] in some girl's mouth." At this point, apparently realizing that he had changed his story, he buried his face in his hands and said, "All right, let me go back." He then told the detective, "They all did something. I know. I remember [the friend] putting his penis in some girl's mouth, [another friend] trying to take some girl's ... bunch of stuff going on, so much going on, I don't remember that good, you know. But I swear—I don't remember that good—but I never touched that woman." Finally, at minute 53:20, he said, "[The other friend] took some girl's pants off.... But I really don't remember that good. I told you more than I can remember." The detective at this point asked why the defendant had not told him earlier that he had been present at the scene of the assault. It was only then—at minute 54:14—that the detective stated that "even you being here in this country is in jeopardy."

¶ 39 The trial court's factual findings, to which the majority should defer, maj. op. ¶ 21, confirm this account. According to the trial court, "the Defendant tells the Detective that [he] remembers another man who was in the apartment the night of the assault placing his penis in the victim's mouth and that another man in the apartment took her pants." Order at 3. The detective then "confronts the Defendant *with the change in story*." *Id.* at 4 (emphasis added). As the trial court further observed, "The Defendant continues to deny his involvement, but implicates the other Defendants." *Id.* It was after this change in story that the detective stated, " 'You need to realize that you need to tell me the truth because even you being in this country is in jeopardy.' " *Id.* In sum, the "change in story" came before, not after, the detective's statement during the first in-

terview. The detective's statement therefore could not, and did not, play "a significant role in inducing inculpatory statements." *See Theander*, 295 P.3d at 971–72 (finding that encouraging the defendant to tell the truth for her children's sake could not have played a significant role in inducing inculpatory statements where the defendant "generally did not respond or make any inculpatory statements after the officers made these comments").

¶ 40 The majority suggests that after the 54–minute mark, the interview produced a "raft of incriminating statements," maj. op. ¶ 13, thus suggesting that the detective's statement did play a significant role in producing inculpatory statements. But the "raft" to which the majority refers had already occurred by this time. For example, the majority suggests that the statements placed the defendant in the apartment at the time of the assault, *id.* at ¶¶ 13 & 29 (statements # 2 & # 4); but, as noted above, he had already admitted that he was present during the assault and saw one of his friends put his penis in the victim's mouth while another friend pulled off her pants. Similarly, the majority suggests that after the 54–minute mark, the defendant admitted to taking the victim home after the assault, *id.* at ¶¶ 13 & 29 (statement # 5); but again, that was part of his story from the beginning. Finally, the majority suggests that after the 54–minute mark, the defendant changed his story about having not been in the apartment during the assault, *id.* at ¶ 29 (statement # 1); once again, the change occurred prior to that time. And while, as the majority notes, the defendant stated after the 54–minute mark that his friends had given the victim a drugged drink, *id.* at ¶ 29 (statement # 3), this statement merely added a bit more detail about what others did during the assault. At no time did the defendant ever admit to taking part in the assault, and instead, as the trial court found, he "continue[d] to deny his involvement, [and] implicate[d] the other Defendants." Order at 3.[1] In sum, the detective's remark at minute

1. In addition, although the majority correctly observes that a proper *Miranda* warning does not preclude a voluntariness challenge, 314 P.3d 836, 847, the fact that the warning was given in this case is a factor weighing in favor of voluntariness. *See, e.g., Gennings*, 808 P.2d at 846–47.

54:14 could not have played a significant role in producing inculpatory statements which the defendant had already made.

¶ 41 The majority never confronts this timing problem directly, instead offering that there need not be "a direct causal link between a specific instance of police conduct and a specific admission by a defendant." Maj. op. ¶ 20 n. 2; *see also id.* at ¶ 22 ("a court need not parse and dissect [the defendant's statements] to determine which may or may not be inculpatory"). But the majority misapprehends the impact that the timing of the defendant's change of story has on the case before us. It is not that there must be an overly precise causal connection between coercive police conduct and a particular statement on the defendant's part, as the majority seems to think. Instead, it is that if the defendant has already changed his story and inculpated himself, subsequent police conduct could not have played a significant role in causing the defendant to change his story and inculpate himself. *Cf. People v.*

*Zadran,* 2013 CO 69, ¶ 19, 314 P.3d 830, 2013 WL 6407914 (Colo. No. 13SA194, December 9, 2013) (noting that "it was improper for the trial court to use statements made by [the defendant] at the end of the interrogation to conclude that [the defendant's] statements were involuntary from the outset").[2]

¶ 42 In the end, without coercive police conduct "causally related to a confession," there is no basis for concluding that a statement is involuntary. *Medina,* 25 P.3d at 1222. Because the record reveals no basis for concluding that the defendant's statements were involuntary in this case, I respectfully dissent from the majority's opinion.

2. The majority reads *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and its progeny *Medina* as standing only for the narrow proposition that a constitutional due process violation can only occur by way of a state actor. Maj. op. ¶ 20, n. 4. These cases do not stand merely for the proposition that there must be state actors involved in some way for there to be a due process violation; rather, they require that the conduct of the state actors must be "causally related to the confession." *Connelly,* 479 U.S. at 164, 107 S.Ct. 515; *Medina,* 25 P.3d at 1222