24CA0212 Peo v Marceleno 05-07-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0212
Weld County District Court No. 22CR293
Honorable Timothy Kerns, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Danny Marceleno,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE YUN
Grove and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 7, 2026

---

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Patrick R. Henson, Alternate Defense Counsel, Chelsea A. Carr, Alternate
Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1    Danny Marceleno appeals the judgment of conviction entered after a jury found him guilty of vehicular eluding, criminal mischief, and two counts of reckless endangerment.  He contends the district court erred by denying his motion to suppress, arguing that his *Miranda* waiver was invalid and his subsequent statements were involuntary.  We disagree and affirm.

## I.    Background

¶ 2    Early one morning, while running license plates in a truck stop parking lot in search of stolen vehicles, Deputy Justin Napolitano and Deputy Steven Fay found Marceleno and his girlfriend asleep inside a car that had been reported stolen, with narcotics strewn across the front seats.  Before attempting to arrest Marceleno, the deputies positioned their patrol cars at the front and rear of the stolen car to block any escape route.  The entire interaction between the deputies and Marceleno was captured on body camera footage.

¶ 3    The deputies then approached from the driver's side and ordered the couple to exit the vehicle.  Upon waking, Marceleno maneuvered the car through a narrow gap near the front patrol car — striking two vehicles and nearly hitting both deputies — and

sped out of the parking lot. A high-speed chase ensued for over ten minutes. The pursuit ended when Marceleno crashed through a community gate blocking his path.

¶ 4     Ten minutes later, the deputies detained Marceleno in the back of a patrol car. When Deputy Napolitano first approached Marceleno, he asked whether Marceleno was okay, and Marceleno responded, "Yeah." Asked whether he needed an ambulance, Marceleno, with his eyes closed, replied, "No, I'm good." He stated that he had not taken more opioids than usual and had not hit his head, but Deputy Napolitano called for emergency medical services anyway.

¶ 5     Deputy Napolitano then introduced himself and asked for basic identifying information. Despite his eyes being intermittently closed, Marceleno responded accurately and corrected Deputy Napolitano when he misspelled Marceleno's name. After confirming that Marceleno had general familiarity with *Miranda* rights, Deputy Napolitano read him those rights, pausing after each one to ask whether Marceleno understood. Marceleno confirmed that he understood each right. Deputy Napolitano then asked if Marceleno,

2

understanding these rights, still wanted to talk to him. Marceleno agreed, saying, "Yeah, it don't matter to me, man."

¶ 6      After the *Miranda* waiver, Deputy Napolitano told Marceleno he had nearly run him over. Marceleno apologized — attributing his actions to being startled — and then apologized again unprompted. Marceleno then admitted that he had outstanding arrest warrants, was on parole, and had fentanyl in the car for personal use. When the paramedics arrived, Deputy Napolitano paused the interview to allow them to examine Marceleno.

¶ 7      After paramedics examined Marceleno, concluding, "[He's] with it and knows where he's at and what's going on," Deputy Napolitano moved him to a second patrol car. Before resuming the interview, Deputy Napolitano again advised Marceleno of his rights and confirmed his continued willingness to speak. Marceleno then stated that he had purchased the car from a man named Chico for $200 — with a promise that Chico would deliver the title at a later date — and that he and his girlfriend had smoked fentanyl before the crash.

¶ 8      About an hour after the chase ended, Deputy Napolitano asked again if Marceleno was okay because he appeared drowsy.

Marceleno said he was more tired than he was high, rating his level of intoxication as a five out of ten. He apologized twice more to Deputy Napolitano, expressed regret for endangering his girlfriend, and insisted that neither he nor his girlfriend was a "big-time drug dealer." He later declined, however, to provide information about Chico or his opioid dealer. Throughout the questioning, Deputy Napolitano remained cordial and thanked Marceleno for his cooperation.

¶ 9 After the interview, Marceleno was transported to the hospital for a blood draw and then to jail for booking. During booking, Marceleno told the jail staff that he had ingested fifteen fentanyl pills that evening — some before the chase and some immediately before his arrest — though his typical daily intake was sixty pills. Concerned, the jail medical staff administered Narcan and sent Marceleno back to the hospital.

¶ 10 Marceleno was charged with (1) vehicular eluding; (2) criminal mischief; (3) attempted second degree murder of Deputies Fay and Napolitano; (4) attempted first degree assault of Deputies Fay and Napolitano; (5) four crime-of-violence sentence enhancers;

4

(6) aggravated motor vehicle theft; and (7) driving under the influence (DUI).[1]

¶ 11    Before trial, defense counsel moved to suppress Marceleno's statements to the deputies. At the suppression hearing, the defense toxicology expert testified that Marceleno's blood draw — which revealed fentanyl, amphetamine, and methamphetamine — indicated he was "significantly intoxicated" at the time of his statements, despite some "tolerance" to fentanyl. The expert added that Marceleno could appear coherent to a layperson by answering basic questions while still being "mentally gone."

¶ 12    Notwithstanding this expert testimony, the district court denied the motion to suppress in a detailed written order after conducting a comprehensive review of the body camera footage. At trial, the prosecution introduced portions of the interrogation video — specifically, Marceleno's statements from the first and second patrol cars, with all references to his warrants and parole excluded. The jury acquitted Marceleno of aggravated motor vehicle theft but convicted him of (1) vehicular eluding; (2) criminal

---

[1] The prosecution dismissed the DUI charge before trial.

mischief; and (3) reckless endangerment — the lesser included offense of attempted second degree murder and attempted first degree assault.

¶ 13    Marceleno now appeals.

## II.    Analysis

¶ 14    Marceleno contends that the district court reversibly erred by denying his motion to suppress because his intoxication rendered (1) his *Miranda* waiver invalid and (2) his subsequent statements involuntary.  We disagree.

### A.    Standard of Review

¶ 15    Our review of the district court's suppression order "presents a mixed question of fact and law." *People v. Thompson*, 2021 CO 15, ¶ 15.  We review the court's factual findings for clear error, accepting them if they are "supported by competent evidence, but we assess the legal significance of the facts de novo." *Id.* (citation omitted).

¶ 16    Additionally, when the challenged interview is video recorded and there are no relevant disputed facts outside of the recording, "we are in essentially the same position as the trial court to determine the question of suppression." *People v. Taylor*, 2018 CO

6

35, ¶ 7.  "Thus, we may undertake an independent review of the recording to determine whether the evidence was properly suppressed in light of the controlling law."  *Id.*

### B.    Validity of *Miranda* Waiver

¶ 17    We first address Marceleno's contention that his *Miranda* waiver was invalid because his "intoxication rendered him unable to make a voluntary,[2] knowing, and intelligent waiver."

### 1.    Applicable Law

¶ 18    The United States and Colorado Constitutions guarantee individuals the right against self-incrimination.  U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18.  To safeguard this right, officers must advise a defendant of his constitutional rights to remain silent and to request an attorney before conducting a

---

[2] Although Marceleno argues that he did not voluntarily waive his *Miranda* rights, he does not develop this argument or cite any legal authority.  *See People v. Cuellar*, 2023 COA 20, ¶ 44 (noting that undeveloped arguments are not addressed).  In any event, self-induced intoxication does not render a *Miranda* waiver involuntary.  *See People v. Platt*, 81 P.3d 1060, 1066 (Colo. 2004) (explaining that because voluntariness is implicated only when government conduct causes the intoxication, if the suspect causes his own intoxication, courts simply examine whether the waiver was knowing and intelligent).  We therefore address only whether Marceleno's waiver was knowing and intelligent.

7

custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A defendant may waive these rights, but a valid waiver must be voluntary, knowing, and intelligent. *People v. Thames*, 2015 CO 18, ¶ 12. The burden falls on the prosecution to establish the validity of the *Miranda* waiver by a preponderance of the evidence. *People v. Knedler*, 2014 CO 28, ¶ 10.

¶ 19  In determining whether a *Miranda* waiver is knowing and intelligent, courts consider the following factors:

> (1) the length of time between the initial *Miranda* advisement and the interrogation; (2) whether the defendant or the interrogating officer initiated the interview; (3) whether and to what extent the interrogating officer reminded the defendant of his or her rights before the interrogation; (4) the clarity and form of the defendant's acknowledgment and waiver; (5) the defendant's background and experience with the criminal justice system; and (6) any language barriers and the defendant's age, experience, education, background, and intelligence.

*Knedler*, ¶ 13.

¶ 20  Self-induced intoxication is an additional factor that may render a waiver unknowing and unintelligent. *Id.* at ¶¶ 14, 17. But "intoxication alone will not invalidate an otherwise valid *Miranda* waiver if the defendant was able to understand the nature of his or

8

her rights and the ramifications of waiving them." *Id.* at ¶¶ 15, 22 (holding that a defendant with a blood alcohol content of .284 validly waived his rights despite his "extreme intoxication"). When intoxication is at issue, courts apply the "*Platt* factors" to determine whether the waiver was knowing and intelligent:

> (1) whether the defendant was oriented to his or her surroundings and situation; (2) whether the defendant's answers were the responsive product of a rational thought process; (3) whether the defendant was able to appreciate the seriousness of his or her situation and the possibility of incarceration; (4) whether the defendant had the foresight to attempt to deceive the police to avoid prosecution; (5) whether the defendant expressed remorse for his or her actions; and (6) whether the defendant expressly stated that he or she understood his or her rights. *Id.*

*Knedler*, ¶ 14 (citing *People v. Platt*, 81 P.3d 1060, 1066 (Colo. 2004)).

### 2. Discussion

¶ 21 Marceleno argues that his *Miranda* waiver is invalid solely under the *Platt* factors. Applying those factors here, we conclude the district court did not err by finding that Marceleno's waiver was knowing and intelligent.

9

¶ 22 First, Marceleno contends that his "body language" shows he was not oriented to his surroundings and situation. But as the district court observed, and as the body camera footage confirms, Marceleno had the wherewithal to maneuver his car through a police blockade and lead the deputies on a ten-minute, high-speed chase. He also "followed directives" from law enforcement and hospital staff and "volunteer[ed] information regarding his outstanding arrest warrants, employment and financial information, and recent drug use." The district court correctly concluded that these facts "all lend themselves to a finding of orientation to surroundings and circumstances." *See People v. Clayton*, 207 P.3d 831, 836 (Colo. 2009) (holding waiver valid when the intoxicated defendant appeared aware of his surroundings and answered questions appropriately).

¶ 23 Second, Marceleno argues his answers were unresponsive because he mumbled and because, after the 4 a.m. blood draw, Deputy Napolitano had to say his name twice and touch his knee to get his attention. But the record supports the district court's finding that Marceleno was "constantly responsive to the questions asked by Deputy Napolitano and other professionals with whom he

10

interacted." Though he appeared tired and mumbled at times, he followed instructions, moved unassisted, and responded rationally — even correcting Deputy Napolitano on two errors: misspelling his name and wrongly stating that his girlfriend had an outstanding warrant.

¶ 24    Third, Marceleno argues he "could not be expected to be aware of . . . the seriousness of his situation" because he was "mentally gone." But, as the district court observed, Marceleno's prior experience with law enforcement — his warrants and parole status — suggests his familiarity with, and appreciation of, the prospect of incarceration. Additionally, the paramedics independently confirmed his ability to comprehend, noting, "[He] knows where he's at and what's going on." And his repeated insistence that he was not a drug dealer further underscores that he understood the gravity of his situation.

¶ 25    Fourth, we agree with Marceleno that he did not attempt to deceive law enforcement. Although he declined to provide information about Chico and his opioid dealer, he was forthcoming about his outstanding arrest warrants, his parole status, and the

11

fentanyl found in the car. Because Marceleno did not engage in any deception, this factor weighs in his favor.

¶ 26 Fifth, Marceleno argues that he did not express genuine remorse because his apologies were prompted. But as the district court found, he repeatedly apologized, both with and without prompting. Even if his first apology was prompted, he later expressed remorse — unprompted — for endangering the lives of his girlfriend and the deputies.

¶ 27 Sixth, Marceleno argues that he made "no clear statement" about his rights, but as the district court observed, and as the video footage shows, Marceleno "acknowledged each portion of the *Miranda* advisement demonstrating he understood each specific right, individually and collectively." Although he sometimes murmured while Deputy Napolitano was still speaking, he clearly confirmed his understanding each time Deputy Napolitano paused to ask, "Do you understand that?" Further, we agree with the court that Deputy Napolitano "did not minimize the significance of his rights" to coax Marceleno's agreement — he explained the rights upfront and reminded Marceleno of his rights throughout the night.

¶ 28    Because at least five of the *Platt* factors weigh in favor of a knowing and intelligent waiver, the district court did not err by denying the motion to suppress.

¶ 29    Nevertheless, Marceleno argues that his intoxication prevented him from validly waiving his *Miranda* rights, pointing to his expert's opinion that he was "significantly intoxicated" and may have been "mentally gone." This argument fails for at least two reasons. First, the expert herself conceded that "there was no way to definitively determine . . . Marceleno's mental functioning." Second, even unrebutted expert testimony "is not dispositive in answering the legal question of whether a defendant knowingly and intelligently waived his *Miranda* rights." *Thames*, ¶ 18; *see also Knedler*, ¶ 23 ("Chemical analysis of blood . . . alone is not sufficient for a court to conclude that a defendant's waiver was not knowing and intelligent."). The law instead requires courts to "focus on the cognitive ability that different people actually exhibit at the time they are asked to waive their rights." *Knedler*, ¶ 23.

¶ 30    That is precisely what the district court did here. After weighing the expert testimony against its own review of the body camera footage and the observations of Deputy Napolitano, the

court concluded that Marceleno had the cognitive ability to understand his rights and chose to waive them.  *See Knedler*, ¶ 17 ("[A] trial court errs if it fails to consider the totality of the circumstances and bases its decision to suppress a defendant's statements solely on intoxication.").  Because the record supports this conclusion, the district court did not err in finding his *Miranda* waiver valid.  *See Thames*, ¶ 24 (concluding that a defendant "need only have had a minimal understanding of his *Miranda* rights in order to have knowingly and intelligently waived them.").

## C.   Voluntariness of Statements

¶ 31    We next address Marceleno's contention that his statements were involuntary because the deputies "coerced" him by "tak[ing] advantage of his intoxication to question him."

### 1.   Applicable Law

¶ 32    A valid *Miranda* waiver does not end the inquiry.  Even when the waiver is knowing, intelligent, and voluntary, a defendant's subsequent statements must still be suppressed if they were involuntary.  *People v. Zadran*, 2013 CO 69M, ¶ 9; *see People v. Jiminez*, 863 P.2d 981, 984 & n.3 (Colo. 1993) ("The issues of voluntariness of a statement and voluntariness of the waiver of

*Miranda* rights that preceded the statement are analytically distinct although factually related.").  Once a defendant challenges the voluntariness of his statements, courts apply a two-step inquiry to determine whether, under the totality of the circumstances, law enforcement "actually overbore the defendant's will."  *People v. McIntyre*, 2014 CO 39, ¶ 19; *see People v. Ramadon*, 2013 CO 68, ¶ 20.  First, we determine whether the circumstances show that the police conduct was coercive.  *Ramadon*, ¶ 20.  Second, if coercive conduct is found, we determine whether it played a significant role in inducing the statement.  *Id.*

¶ 33    Both steps require weighing the following nonexhaustive factors:

> (1)    whether the defendant was in custody;
>
> (2)    whether the defendant was free to leave;
>
> (3)    whether the defendant was aware of the situation;
>
> (4)    whether the police read *Miranda* rights to the defendant;
>
> (5)    whether the defendant understood and waived *Miranda* rights;
>
> (6)    whether the defendant had an opportunity to confer with counsel or

anyone else prior to or during the interrogation;

(7) whether the statement was made during the interrogation or volunteered later;

(8) whether the police threatened [the] defendant or promised anything directly or impliedly;

(9) the method or style of the interrogation;

(10) the defendant's mental and physical condition just prior to the interrogation;

(11) the length of the interrogation;

(12) the location of the interrogation; and

(13) the physical conditions of the location where the interrogation occurred.

*Id.* at ¶ 20 (citation omitted).

## 2. Discussion

¶ 34    Although Marceleno was intoxicated during his detention, the relevant factors weigh in favor of voluntariness:

- Marceleno was aware of his situation — he explained why he fled and clarified that the fentanyl was for personal use only.

- Deputy Napolitano read Marceleno his *Miranda* rights and explained each right in plain English.

16

- Marceleno knowingly waived his *Miranda* rights: He confirmed his understanding after each right was read, agreed to speak with Deputy Napolitano on multiple occasions, and withheld information that might incriminate others.

- Marceleno conceded that Deputy Napolitano neither threatened him nor promised him anything.

- Deputy Napolitano's interrogation style was professional, empathetic, and conversational throughout — never aggressive, threatening, or deceptive.

- Marceleno represented that his condition was adequate: He said he was fine, declined an ambulance, explained he had taken his usual amount of fentanyl, insisted he was just tired, and rated his level of intoxication as a five out of ten.

- Marceleno's manner of engagement further confirmed his lucidity. He answered questions directly, controlled the scope of his responses, and showed no signs of tangential thinking or illogical reasoning.

¶ 35 Marceleno argues that law enforcement took advantage of his intoxication, but the district court found, and we agree, that Deputy

"Napolitano did not prey upon Mr. Marceleno's intoxication." To the contrary, despite Marceleno's repeated assurances that he was fine, Deputy Napolitano summoned emergency medical services and continued to check on him throughout the night, even after the paramedics cleared him. Marceleno now turns that very concern against the prosecution by arguing that suppression was required. But "intoxication alone does not automatically render statements involuntary." *People v. Martin*, 30 P.3d 758, 760 (Colo. App. 2000). Critically, the record contains no evidence of coercive conduct — a necessary predicate to any finding of involuntariness. *See People v. Smiley*, 2023 CO 36, ¶ 20 (explaining that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986))).

¶ 36 Accordingly, the district court did not err by denying the motion to suppress. The totality of the circumstances reveals no coercive conduct, and Marceleno's statements were therefore voluntary.

### III. Disposition

¶ 37 The judgment is affirmed.

JUDGE GROVE and JUDGE SCHOCK concur.