2013 CO 69

The PEOPLE of the State of Colorado,
Plaintiff-Appellant

v.

Khaled ZADRAN, Defendant-Appellee.

Supreme Court Case No. 13SA194

Supreme Court of Colorado.

December 9, 2013

As Modified Dec. 12, 2013.

Attorneys for Plaintiff–Appellant: George H. Brauchler, District Attorney, Eighteenth Judicial District, L. Andrew Cooper, Chief Deputy District Attorney, Centennial, Colorado.

Attorneys for Defendant–Appellee: Douglas K. Wilson, Public Defender, Jessica Enggasser, Deputy State Public Defender, Centennial, Colorado.

JUSTICE HOBBS delivered the Opinion of the Court.

¶1 The prosecution brings this interlocutory appeal challenging the Arapahoe County District Court's suppression of Khaled Zadran's statements, which were obtained through a custodial interrogation at the Au-

rora Detention Center on January 23, 2013.[1] The police arrested and interrogated Zadran in the course of an investigation of a suspected drug dealer. At issue here is whether the police officer who interrogated Zadran engaged in coercive conduct sufficient to render Zadran's inculpatory statements involuntary. The trial court found that Officer Wheelis, the interrogating officer, made improper implied promises and had a generally coercive demeanor. Thus, the trial court concluded that all of Zadran's statements at the Aurora Detention Center were involuntary and inadmissible. We hold, under the totality of the circumstances, that the interrogation at the Aurora Detention Center was not coercive and the statements were voluntary. Accordingly, we reverse the trial court's suppression order.

## I.

¶ 2 In May 2012, the Aurora Police Department began investigating an individual suspected of selling marijuana to high school students. During the investigation, the police found a phone number they suspected belonged to the individual selling marijuana. By conducting a "reverse phone look up," the police were able to find a name, picture, and address associated with the phone number. This information all pointed to Zadran. Based on that information, on January 23, 2013, the police began surveillance of the address. During the surveillance, the police saw a person, who matched the picture from the "reverse phone look up," exit the home and drive away in a silver Infinity vehicle. Over a span of forty minutes, the police saw the driver of the Infinity conduct what they suspected to be multiple drug deals. The police stopped the silver Infinity for a traffic violation. Zadran was the person driving the car. He consented to a search of his vehicle and stood off to the side of the vehicle, not in handcuffs, while the police searched the car. During the search, the police found a scale, a medical marijuana card, and some marijuana residue called "shake."

¶ 3 The police searched Zadran's person, arrested him, and transported him to the Aurora Detention Center. The police found roughly $900 in cash and numerous medical marijuana coupons on Zadran. Officer Ellison testified that while he transported Zadran to the detention center, Zadran seemed relaxed. He asked Ellison whether he was under arrest, and Ellison told him he was under arrest for the distribution of narcotics.

¶ 4 At the Aurora Detention Center, Officer Wheelis conducted a custodial interrogation of Zadran. Before advising Zadran of his *Miranda* rights, Wheelis said,

> I'm just telling you what I'm going to talk to you about. I think it would be in your best interest to talk to me. I think you are going to be interested in some of the things that I already know. You don't have to talk to me. I'm going to advise you of your rights. I'm going to let you read this form, sign it, and you can [ ] talk to me. You don't have to.

Zadran then signed a *Miranda* waiver and consented to answering questions. Wheelis said, "You may stop answering at any time, if you like. We'll have a little conversation." Zadran did not ask for a lawyer. Wheelis proceeded to ask Zadran questions about his involvement in selling marijuana to high school students.

¶ 5 During the custodial interrogation, Zadran made numerous inculpatory statements to Wheelis. For example, he admitted that he had been selling marijuana for several months. The tone of the interrogation was conversational, Wheelis placed very little pressure on Zadran, and Zadran answered questions in a calm and clear manner. Wheelis attempted to obtain Zadran's consent to search his bedroom at Zadran's parent's house. Toward the end of the exchange, Wheelis said, "I'm telling you, you want to get ahead of this. You want to make things right. You want a positive outcome from this. I'm trying to do the [least] invasive thing that I can do here, okay, and this is it. I'm not threatening you or anything." The interview ended when Zadran refused to

---

1. The question on review is:

1. Whether the defendant's *Miranda* waiver and confession were voluntary, when the totality of the circumstances are properly assessed.

consent to a police search of his bedroom. The entire interview lasted about seventeen minutes.

¶6 At a suppression hearing, Zadran moved to suppress as involuntary all of the statements that he made during custodial interrogation at the Aurora Detention Center. The trial court concluded that all of the statements were involuntary and inadmissible because "the officer's general demeanor and actions throughout the interview were coercive."

¶7 The prosecution appeals the trial court's ruling.

## II. Analysis

¶8 We hold, under the totality of the circumstances, that the interrogation of Zadran at the Aurora Detention Center was not coercive and that Zadran's statements were voluntary. Accordingly, we reverse the trial court's suppression order.

### A. Standard of Review

¶9 Under the due process clauses of the United States and Colorado constitutions, a defendant's inculpatory statements made during a custodial interrogation must be voluntary to be admissible into evidence. *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010); *People v. Miranda–Olivas*, 41 P.3d 658, 660–61 (Colo. 2001) (finding no police coercion). Guilt in a criminal trial must be established by evidence independently and freely secured without officials resorting to coercion. *People v. Medina*, 25 P.3d 1216, 1221–22 (Colo. 2001) (citing *Malloy v. Hogan*, 378 U.S. 1, 8–9, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). In a suppression hearing, when a defendant makes a prima facie evidentiary showing that inculpatory statements were involuntary, the prosecution bears the burden by a preponderance of the evidence to establish that they were voluntary. *People v. Ramadon*, 2013 CO 68, ¶19, 314 P.3d 836, 841–42, 2013 WL 6408594 (Colo. Dec. 9, 2013); *People v. Raffaelli*, 647 P.2d 230, 234–35 (Colo. 1982).

¶10 The focus of the voluntariness inquiry is whether, under the totality of the circumstances, the behavior of the official

was coercive so as to overbear the defendant's will in making the statements. *Miranda–Olivas*, 41 P.3d at 661; *Medina*, 25 P.3d at 1222. The voluntariness doctrine requires a two-step inquiry. *See Ramadon*, ¶20, 314 P.3d 836, 841–42; *Medina*, 25 P.3d at 1222. First, the police conduct must have been coercive. *Ramadon*, ¶20, 314 P.3d 836, 841–42 ("Coercive physical or psychological conduct by the government renders an otherwise voluntary statement involuntary if the conduct plays a significant role in inducing the statement."). Second, the coercive police conduct must have played a significant role in inducing the statement. *Id.* ("Courts determine voluntariness of the statement by a consideration of the totality of the circumstances under which the statement was given, looking at the significant details surrounding and inhering in the interrogation under consideration.").

¶11 In the first inquiry, courts evaluate the official's actions to determine whether the conduct was coercive. *People v. Valdez*, 969 P.2d 208, 211 (Colo. 1998); *People v. Gonzalez–Zamora*, 251 P.3d 1070, 1076 (Colo. 2011). This inquiry is necessary because under both the state and federal constitutions coercive physical or psychological conduct by the government is necessary for a finding that a defendant's due process rights have been violated. *Medina*, 25 P.3d at 1222; *Ramadon*, ¶20 n. 2, 314 P.3d 836, 842. Courts look to the totality of the circumstances surrounding the interrogation at issue to answer the coercion inquiry. *People v. Gennings*, 808 P.2d 839, 844 (Colo. 1991). Courts consider the following nonexclusive list of factors:

(1) whether the defendant was in custody;

(2) whether the defendant was free to leave;

(3) whether the defendant was aware of the situation;

(4) whether the police read *Miranda* rights to the defendant;

(5) whether the defendant understood and waived *Miranda* rights;

(6) whether the defendant had an opportunity to confer with counsel or anyone

else prior to or during the interrogation;

(7) whether the statement was made during the interrogation or volunteered later;

(8) whether the police threatened [the] defendant or promised anything directly or impliedly;

(9) the method of the interrogation;

(10) the defendant's mental and physical condition just prior to the interrogation;

(11) the length of the interrogation;

(12) the location of the interrogation; and

(13) the physical conditions of the location where the interrogation occurred.

*Medina*, 25 P.3d at 1222–23 (citing to and applying factors established in *Gennings*, 808 P.2d at 844); *Ramadon*, ¶ 20, 314 P.3d 836, 841–42 (citing *Medina*, 25 P.3d at 1222–23).

¶ 12 Next, courts determine whether the coercive police conduct played a significant role in inducing the defendant to make subsequent inculpatory statements. *Ramadon*, ¶ 20, 314 P.3d 836, 841–42; *Gonzalez–Zamora*, 251 P.3d at 1076. If the police conduct played a significant role in inducing the statements, then those later statements must be excluded. *Ramadon*, ¶ 22, 314 P.3d 836, 843. This inquiry does not require the court to find the defendant actually confessed to a crime after the police coercion to find that the defendant's due process rights have been violated. *Id.* at ¶ 18, 314 P.3d 836, 841. Instead, courts examine whether the defendant's inculpatory statements could be used as evidence against the defendant at trial. *Id.* If so, and if the statements were procured by coercion, they must be excluded. *Id.* at ¶ 22, 314 P.3d 836, 843.

¶ 13 The trial court's ruling presents a mixed question of fact and law. *People v. Arroya*, 988 P.2d 1124, 1129 (Colo. 1999). We defer to the trial court's findings of historical fact and will not overturn those findings if they are supported by competent evidence in the record. *People v. Guthrie*, 2012 CO 59, ¶ 10, 286 P.3d 530. However, we review the legal effect of facts *de novo*.

*Valdez*, 969 P.2d at 211. If we conclude that a defendant's statements were made involuntarily, they must be completely suppressed—they may not be used either as substantive evidence or for impeachment purposes. *People v. Jensen*, 747 P.2d 1247, 1251–52 (Colo. 1987) ("Confessions … of a defendant are not admissible in evidence for any purpose unless they are voluntarily made.").

## B. Application to this Case

¶ 14 Under the facts of this case, we conclude that the trial court erred in determining that the totality of circumstances demonstrated police coercion under the first prong of the voluntariness inquiry. The trial court concluded that "the officer's general demeanor and actions throughout the interview were coercive" because the officer had consistently told Zadran that things would go better, that it was in his best interest, and that he would end up with a positive outcome if he did what was necessary to make it right.

¶ 15 As with any question of mixed fact and law, we conduct an independent and *de novo* review of the trial court's legal conclusions based on the factual record. Examining the transcript of the suppression hearing, reviewing the trial court's findings of fact, and applying the factors annunciated in *Gennings*, 808 P.2d at 844, and applied in *Medina*, 25 P.3d at 1222–23, we note the following: (1) Zadran was in custody; (2) he was not free to leave; (3) he was aware of the situation surrounding his arrest; (4) he had been read his *Miranda* rights; and (4) he had waived his *Miranda* rights. The trial court found the following statements to be implied promises, which the court determined to constitute police coercion:

(1) I think it would be in your best interest to talk to me;

(2) I think you are going to be interested in some of the things that I already know;

(3) It is what it is. You messed up. You know you messed up; and

(4) You want to get ahead of this. You want to make things right. You want a positive outcome from this. I'm try-

ing to do the [least] invasive thing that I can do here.

¶ 16 We conclude that these statements, separately or together, did not amount to coercion constituting a due process violation. This line of police questioning attempted to establish a friendly rapport with Zadran and did not involve tactics that exploited his weaknesses or vulnerabilities under the circumstances of the interrogation. "The purpose of the test is to examine the tactics used by the police given the situation, the defendant's vulnerability, and other attendant circumstances." *Ramadon*, ¶ 26, 314 P.3d 836, 843–44. Given all of the circumstances surrounding Wheelis's interrogation of Zadran, we conclude that the police conduct was not coercive in this case.

¶ 17 A comparison between *Ramadon*, a recent case from this court on this same issue, and the case at hand is illuminating for the purpose of determining the kind of police conduct that amounts to coercion. In *Ramadon*, the defendant had a particular set of vulnerabilities that the police exploited for the purpose of obtaining inculpatory statements. Ramadon was a native of Iraq whom the United States military brought to the United States for Ramadon's safety after he helped the military in the second Iraq war. Ramadon feared that if he ever returned to Iraq, he would be killed by the Iraqi insurgents. The police in *Ramadon* used this fear of deportation and death to elicit inculpatory statements, and we determined that tactic to be coercive. *Id.* at ¶ 28, 314 P.3d 836, 844. In this case, the police did not exploit a specific or unique vulnerability of Zadran's. The interrogation of Zadran was very detached from specific realities for Zadran. Although Wheelis did say, "I think it would be in your best interest to talk to me," this statement did not amount to any specific threat or promise. There is no information about Zadran in the record that would suggest that Wheelis's generic statement about the benefits of cooperating with the police would be enough to overbear Zadran's will. In contrast, the police officer in *Ramadon* had reason to know that the threat of deportation could cause Ramadon to provide inculpatory statements. There are simply no facts in this case to suggest that Zadran's inculpatory statements were anything but voluntary.

¶ 18 Additionally, comparing the case at hand to *Medina*, in which we examined this same issue, is useful for the purpose of discerning the existence of police coercion. In *Medina*, the defendant was suspected of abusing his child. In an effort to obtain information about the abuse, the police told Medina, the defendant, that they would take the child away from Medina unless he confessed. The police made Medina believe that if he confessed, the child would at least be able to remain with the child's mother. We determined that the coercive police conduct played a significant role in inducing Medina to provide the inculpatory statements.

¶ 19 In this case, there was no threat by Wheelis, express or implied, that would have overborne Zadran's will. Simply saying that "it would be in [Zadran's] best interest" to talk is not enough of a threat or promise to amount to police coercion. In this case, there is a dearth of facts demonstrating coercive police conduct. The length of the interrogation was very short, Zadran seemed calm and composed, and the style of the interrogation was conversational. Further, it was improper for the trial court to use statements made by Wheelis at the end of the interrogation to conclude that Zadran's statements were involuntary from the outset. Under the totality of the circumstances, we determine there was no coercive police conduct rendering any part of the interrogation questions and answers inadmissible. We conclude that Zadran's statements were voluntary.

### III. Conclusion

¶ 20 Accordingly, we reverse the suppression order and return this case to the trial court for further proceedings consistent with this opinion.