Opinion by JUDGE FREYRE
¶ 1 Defendant, Brian K. Springsted, appeals the judgment of conviction entered upon a jury verdict finding him guilty of one count of first degree murder, one count of conspiracy to commit first degree murder, and two counts of violent crime. We reverse and remand for a new trial.
I. Background
¶ 2 This case involves the shooting death of the victim, Daniel "Chopps" Baird. The prosecution presented evidence that the victim was shot by two different people, and the primary issue at trial was the identity of the second shooter.
¶ 3 The first shooter, codefendant Michael Malory (Popeye), allegedly shot the victim in retaliation for an arson the victim committed against Popeye's friend. The shooting occurred at Popeye's house, in his kitchen. Springsted and Nathan Varnadore were present during the incident.
¶ 4 During trial, the prosecution presented evidence that there was an ongoing dispute between Popeye and the victim regarding the arson, that Popeye invited the victim to his house via text messages and phone calls, that Popeye and the victim argued, and that the victim was shot once in the face and twice in the chest with different guns.
¶ 5 Shortly after the shooting, a police officer, who was in the neighborhood for unrelated reasons, responded to the house. When she entered, the officer saw the victim on the kitchen floor and observed Springsted coming up the stairs from the basement. Within one hour of the shooting, Springsted was in a police interview room for questioning and evidence collection.
¶ 6 Over the course of the next four days, the police conducted five interviews of Springsted totaling more than eleven hours and eventually arrested him for the victim's death. The prosecution's evidence implicating Springsted as the second shooter included Springsted's descriptions of the shooting from these interviews, his text messages to other friends anticipating the victim's arrival, and statements from two witnesses who testified that Springsted told them he shot the victim to put the victim out of his misery.
¶ 7 The serological evidence, however, implicated only Popeye as a shooter; it did not implicate Springsted. Specifically, the victim's blood was found on Popeye's clothing, while none was found on Springsted's.
¶ 8 A jury convicted Springsted of all counts, and the court sentenced him to life imprisonment. On appeal, Springsted challenges only the court's admission of his statements from the police interviews, alleging that they were obtained involuntarily.
II. Admissibility of the Recorded Statements
A. Preservation
¶ 9 As an initial matter, the People contend that Springsted did not raise the same argument in the trial court that he now raises on appeal and, therefore, that he did not preserve the issue for our review. Specifically, the People allege that Springsted's arguments in his suppression motion addressed each interview separately, while on appeal he argues the cumulative effect of these interrogations. Springsted contends that he preserved the cumulative issue by challenging the voluntariness of each statement in his motion to suppress and by arguing at the motions hearing that the police would "build on" prior interrogations when conducting new ones.
¶ 10 We conclude that Springsted sufficiently preserved this issue for our review. Parties are not required to use "talismanic language" to preserve particular arguments *708 for appeal; rather, the trial court must be presented with an adequate opportunity to make findings of fact and conclusions of law on any issue before we will review it. People v. Melendez , 102 P.3d 315, 322 (Colo. 2004). Springsted filed a motion to suppress the statements, alleging they were involuntary. The trial court held a hearing and issued a ruling in which it specifically discussed the cumulative effect of the interrogations. The court stated, "I looked at all the videos as a whole to determine if at any point the interviews, because of the cumulative effect, became involuntary or improper." Accordingly, because the trial court was presented with an adequate opportunity to make findings of fact and conclusions of law on the cumulative impact of the interrogations, we conclude this claim is preserved for our review. See id.
B. Relevant Facts
¶ 11 On May 3, 2014, Springsted was in Popeye's home when the victim was shot three times and died. Within an hour of the shooting, Springsted was in a police interview room. This first interview lasted approximately three and one-half hours. Officers never provided Springsted an advisement under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and instead told him he was a witness and not a suspect. After the interview, Springsted was allowed to leave the station.
¶ 12 The second interview occurred less than four hours later when officers arrived at Springsted's home and requested that he return to the sheriff's office for more questioning. This time, the officer advised Springsted of his Miranda rights, which Springsted waived, but did not inform Springsted he was now a suspect. The interview lasted two hours, and the officer's demeanor was more aggressive. The officer told Springsted he faced life imprisonment, suggested the shooter likely put the victim out of his misery by shooting him in the chest, said the codefendant was not "going down" alone, and stated that the first person who was honest generally received the "most slack." Springsted responded that either he or Varnadore could have shot the victim-he could not remember. He said if he did shoot the victim, "it was probably just for mercy." Springsted was allowed to leave at the end of the interview.
¶ 13 The third interview occurred the following day and lasted another four and one-half hours. Springsted again received a Miranda advisement and agreed to speak with the officers. Two different officers, separated by minutes, questioned Springsted in a confrontational manner. The officers, in raised voices, repeatedly cursed, repeatedly accused Springsted of lying, told Springsted he was going to prison, asked if he loved his wife, said they knew he had shot the victim out of mercy, asked whether his religion condoned murder, and asked whether they should tell the district attorney to charge him with first or second degree murder.
¶ 14 This time, Springsted said if he killed the victim he used a .45 caliber gun and that Popeye used a .50 caliber gun. He said he shot the victim to put him out of his misery and that he did not want to hurt anyone. He said gunshot residue from the .45 caliber gun would be on his hands and that his DNA would be on the gun. He was again released.
¶ 15 The following day, after threatening Springsted's wife with potential charges, the police located Springsted and arrested him. The fourth interview, which lasted another hour, was consistent in content, tone, and confrontation level with the third; however, Springsted remained in custody at its conclusion. Eleven minutes after the fourth interview, a different officer conducted the final interview. In contrast to the previous officers, this officer did not raise his voice, did not curse at Springsted, and was not accusatory. This last interview-in which Springsted admitted watching Popeye text the victim to get the victim to the house, described the argument between the victim and Popeye, explained how Popeye shot the victim, and detailed how and where he was when he shot the victim-was played for the jury.
C. Standard of Review
¶ 16 We review a trial court's ruling on a motion to suppress as a mixed question of law and fact. People v. Ramadon , 2013 CO 68, ¶ 21, 314 P.3d 836. We defer to the trial court's factual findings and uphold *709 them on review where those findings are supported by the record. Effland v. People , 240 P.3d 868, 878 (Colo. 2010). However, we review the legal effect of facts de novo. Ramadon , ¶ 21. Where the interrogation is video- or audio-recorded and there are no disputed facts outside the recording pertinent to a suppression ruling, we are in the same position as the trial court in deciding the voluntariness issue. Ramadon , ¶ 21. In such instances, the question on appeal is one of law and is reviewed de novo. See People v. Valdez , 969 P.2d 208, 211 (Colo. 1998) ; People v. Wickham , 53 P.3d 691, 694 (Colo. App. 2001) ; see also People v. Miranda-Olivas , 41 P.3d 658, 661 (Colo. 2001) ("[W]here the record below reveals no conflicting evidence regarding the details of the encounter, remand is unnecessary where the appellate court can apply the correct legal standard.").
¶ 17 Additionally, we review errors involving a constitutional violation under the constitutional harmless error standard. Hagos v. People , 2012 CO 63, ¶ 11, 288 P.3d 116. These errors require reversal unless the reviewing court is "able to declare a belief that [the error] was harmless beyond a reasonable doubt." Id. (alteration in original) (quoting Chapman v. California , 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ). In other words, we reverse if "there is a reasonable possibility that the [error] might have contributed to the conviction." Id. (alteration in original) (quoting Chapman , 386 U.S. at 24, 87 S.Ct. 824 ).
D. Applicable Law
¶ 18 Under the Due Process Clauses of the United States and Colorado Constitutions, only voluntary statements made by a defendant are admissible into evidence. U.S. Const. amends. V, XIV ; Colo. Const. art. II, § 25 ; see also Mincey v. Arizona , 437 U.S. 385, 387, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ; People v. Raffaelli , 647 P.2d 230, 234 (Colo. 1982). In contrast, involuntary statements are inadmissible
not because such [statements] are unlikely to be true[,] but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system-a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.
Rogers v. Richmond , 365 U.S. 534, 540-41, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). For a statement to be involuntary, government coercion must have played a significant role in obtaining it. Colorado v. Connelly , 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("[A]ll [confession cases] have contained a substantial element of coercive police conduct."); Ramadon , ¶ 18.
¶ 19 When a defendant seeks to suppress a statement as involuntary, the prosecution must prove by a preponderance of the evidence that the statement resulted from a free and unconstrained choice by the maker. Ramadon , ¶ 19. The statement must not be the product of "any direct or implied promises, however slight," or result from the government's exertion of improper influences. People v. Medina , 25 P.3d 1216, 1222 (Colo. 2001). Coercive physical or psychological governmental conduct renders an otherwise voluntary statement involuntary if that conduct plays a significant role in inducing the statement. Id. "Coercive conduct includes not only physical abuse or threats directed against a person, but also subtle forms of psychological coercion." Ramadon , ¶ 19."The deliberate exploitation of a person's weakness by psychological intimidation can, under some circumstances, constitute a form of governmental coercion that renders a statement involuntary." Id.
¶ 20 "The focus of the voluntariness inquiry is whether, under the totality of the circumstances, the behavior of the official was coercive so as to overbear the defendant's will in making the statements." People v. Zadran , 2013 CO 69, ¶ 10, 314 P.3d 830. This is a two-step inquiry involving (1) whether the officer's behavior was coercive; and (2) if so, whether that coercive behavior played a significant role in inducing the defendant's statement. Ramadon , ¶ 20.
¶ 21 Courts determine voluntariness by considering the totality of the circumstances under which the statements were *710 given, looking at the significant details surrounding and inhering in the interrogation under consideration. Id. Courts examine both the defendant's ability to resist coercive pressures and the nature of the police conduct, using a nonexclusive list of factors that includes:
(1) whether the defendant was in custody;
(2) whether the defendant was free to leave;
(3) whether the defendant was aware of the situation;
(4) whether the police advised the defendant of his or her Miranda rights;
(5) whether the defendant understood and waived Miranda rights;
(6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;
(7) whether the statement was made during the interrogation or volunteered later;
(8) whether the police threatened [the] defendant or promised anything directly or impliedly;
(9) the method or style of the interrogation;
(10) the defendant's mental and physical condition just prior to the interrogation;
(11) the length of the interrogation;
(12) the location of the interrogation; and
(13) the physical conditions of the location where the interrogation occurred.
Id. (alteration in original) (quoting Medina , 25 P.3d at 1222-23 ).
¶ 22 Finally,
[w]hen coercion produces a series of statements, a court need not parse and dissect them to determine which statements may or may not be inculpatory. Instead, the entire interrogation that follows the point at which the police conduct becomes coercive under the totality of the circumstances must be suppressed in its entirety.
Id. at ¶ 22.
E. Analysis
¶ 23 We begin our analysis by addressing those factors common to all of the interviews. First, all five interviews occurred at the sheriff's office and in a traditional interview room. The record does not indicate, nor did the court find, whether the door was locked. Several tapes reveal that Springsted knocked on the door from the inside and asked to leave to use the restroom, but none of them shows that he ever attempted to open the door himself. Because the parties agree Springsted was in custody for the last four interviews and do not otherwise contest the location or physical conditions of the interrogations, we conclude Springsted was not free to leave during them, despite his release after the first three.
¶ 24 Second and similarly, the parties do not dispute that Springsted received Miranda warnings in the last four interviews and agreed to speak with the officers. Thus, we find the record supports the trial court's findings that the police advised Springsted of his rights and that Springsted understood and waived them.
¶ 25 Third, the record does not show and neither party argues that Springsted had any prior experience with the criminal justice system, or with the interrogation process, before these interviews. Moreover, neither party argues Springsted's level of education, and, we note that, on occasion, Springsted had difficulty reading and spelling. Although not mentioned in the trial court's order, we find that these circumstances are relevant in assessing Springsted's awareness of his situation and his ability to resist psychological pressures during the interviews. See People v. Blankenship , 30 P.3d 698, 703-04 (Colo. App. 2000) (finding education level and prior involvement with the law relevant to voluntariness determination).
¶ 26 Fourth, the record shows, and the parties do not dispute, that Springsted's demeanor did not change during the interviews despite the officers' increasingly aggressive and confrontational tactics. The videos show *711 Springsted in a hunched position, often with his head in his hands. He consistently spoke in a muted and respectful tone and never raised his voice.
¶ 27 Finally, the court found, the record supports, and the parties do not dispute that Springsted had the opportunity to consult with counsel between interviews and did not do so. We disagree that this fact was significant between the first and second interviews because the officer told Springsted he was only a witness. Thus, he had no need to consult with counsel after the first interview. We acknowledge that the police twice told Springsted before his arrest that he had a right to counsel. However, Springsted's lack of experience in the criminal justice system, coupled with the officers' repeated release of him following the interrogations, causes us to consider this factor less heavily than we might in the case of a defendant with prior criminal or interrogation experience.
¶ 28 In its ruling, the trial court acknowledged the increasingly aggressive nature of the interrogations, including the officers' raised voices, repeated cursing, and repeated threats. Nonetheless, it concluded the officers made no promises or threats to Springsted that overbore his will or caused him to make incriminating statements. It found that Springsted resisted the officers' pressures; that he did not change his story; and thus, that his statements were voluntary.
¶ 29 Noting well-settled law from our supreme court that a statement is not voluntary if extracted by any sort of police threats or promises, and after a careful review of the more than eleven hours of videotape, we conclude that the court's voluntariness finding is not supported by the evidence as to the last three interviews. See Medina , 25 P.3d at 1223 (citing People v. Gennings , 808 P.2d 839, 843 (Colo. 1991) ).
1. First Interview
¶ 30 The video record supports the court's findings that the officer maintained a conversational and friendly tone-even sharing stories of his own time in the Army-in order to build rapport with Springsted. Although the interview lasted more than three hours, the officer allowed Springsted to use the restroom, provided him with water, and asked him if he wanted any food. Furthermore, the officer never raised his voice, but instead, repeatedly assured Springsted that he was "almost done" and would be able to "get him out of [there] soon."
¶ 31 Although the video reveals that Springsted appeared nervous and stressed, he answered the officer calmly. At one point, the officer explicitly told Springsted that he was a witness, not a suspect. But see People v. Rex , 636 P.2d 1282, 1284 (Colo. App. 1981) (holding that deceiving the defendant into believing he was not a suspect was coercive). Accordingly, we conclude that the record supports the court's finding that Springsted was not in custody and affirm the court's voluntariness finding as to this interview.
2. Second Interview
¶ 32 The second interview presents a closer question because the interrogating officer was far more confrontational. The officer told Springsted he faced life in prison, encouraged Springsted to "come clean" and "not get caught up in somebody's plan," accused Springsted of lying, and said Springsted would receive "more slack" if he was honest. The interview occurred late at night only a few hours after the first. Nevertheless, Springsted continued to deny involvement in the victim's death and said only that it was possible that he or Varnadore could have shot the victim, but that he could not remember. Under the totality of these circumstances, we cannot conclude that the officer's statements constituted promises of leniency in exchange for a confession or that the officer's conduct overbore Springsted's will.
¶ 33 We acknowledge that the officer's "more slack" statement comes close to constituting an implied promise. See Medina , 25 P.3d at 1223 (stating that "direct or implied promises, however slight," are not voluntary). However, the officer made the statement only once during a lengthy interview and did not link it to Springsted's potential receipt of any particular benefit. See Zadran , ¶¶ 15-17 (concluding that officer's statements that "it would be in your best interest to talk to me," "you messed up," "[y]ou want to get ahead of *712 this," and "[y]ou want a positive outcome from this" were not implied promises). Moreover, in contrast to the later interviews, the officer's conduct did not involve tactics that exploited Springsted's vulnerabilities or his weaknesses. Accordingly, we conclude that the record supports the trial court's voluntariness findings and affirm the admissibility of the second interview.
3. Third Interview
¶ 34 We reach a different conclusion after reviewing the videotape of the third interview, however, and conclude that the record contradicts the court's finding that the officers' conduct was not coercive and that Springsted did not change his story.
¶ 35 A statement is not voluntary "if extracted by any sort of threats or violence or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." Medina , 25 P.3d at 1223 (quoting Gennings , 808 P.2d at 843 ); see also United States v. Levy , No. 16-CR-270, 217 F.Supp.3d 643, 661, 2016 WL 6835539, at *11 (E.D.N.Y. Nov. 21, 2016) ("[T]he constitutional inquiry is ... whether the confession was free and voluntary; that is, [it] must not be exacted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."). Although police questioning that attempts to establish a friendly rapport with the defendant by encouraging truthfulness may not rise to the level of coercion, police questioning that promises to avoid punishment or hardship does rise to the level of coercion. See People v. McIntyre , 2014 CO 39, ¶ 19, 325 P.3d 583 ; Zadran , ¶ 16 ; People v. Parada , 188 Colo. 230, 533 P.2d 1121, 1123 (1975).
¶ 36 The third interview occurred less than twenty-four hours after the second. Springsted voluntarily returned to the station and was subsequently interrogated for nearly five hours by two different officers. While the first officer advised Springsted of his rights, the second officer did not re-advise or remind Springsted of those rights before beginning his portion of the interrogation.[1]
¶ 37 The videotape reveals that the officers yelled, cursed, threatened Springsted with life in prison more than a dozen times, accused Springsted of lying more than twenty times, and exploited Springsted's marital relationship, saying things such as the following:
• You going to like staying in prison?
• Here's the thing I'm trying to figure out. You're married, right? And you really want to go to prison for the rest of your fucking life?
• If you don't start remembering, you are going to prison for the rest of your life. How long you been married? Do you love your wife?
• You're going to prison for the rest of your life, okay?
• You're going to prison for the rest of your life. You're thirty-two? You're gonna spend the rest of your life in prison for protecting an old fucking man.
• You know what is going to happen? You are going to have the rest of your life to try to remember, ok? For popping two rounds into Chopps. That's a long time. Because when I get to court, I'm going to prove by these text messages that you knew what was going to happen when Chopps got over there.
• So how long is it going to take from now until court until you go to prison for the rest of your life until you remember exactly what happened?
• Well, you're gonna end up in prison for the rest of your life. While you're in prison you're gonna think about your family, okay? And I'm not just talking about your wife.
*713 • Don't come in here and blow smoke up my ass, because I've been doing this for eighteen fucking years. Okay?
• After doing this for eighteen years, you're full of shit.
• You can bring up all this other bullshit, but it didn't happen that way.
• You gotta quit blowing smoke up my ass.
• You know, if you were in the wrong place, wrong time, fucking tell me. That looks a lot better than you blowin'....
• You love your wife.... Okay, so what I'm giving you here is an opportunity, okay? Wrong place, wrong time, this is what I saw. 'Cause if you're trying to protect Popeye, or you're trying to protect Nate, you're putting the village before yourself. That's the thing, it looks better, like I said, wrong place, wrong time, shit went bad, shit went bad, okay?
• Because you want to go to prison for the rest of your life? It looks a lot better if you're up front. Here's what happened. Here's why it happened. It looks a lot better in front of those twelve fucking jurors sittin' over there versus "I don't remember, I don't recall."
• You're fucked. But I'm trying to give you an opportunity to tell me what happened.
• You're a Mormon.... Do Mormons believe in murder.... Is it okay to do that? Shoot that mother fucker in the chest?
• Here's what I have to do. I have to go to the district attorney's office and tell them "He saw Popeye shoot the guy and he saw him suffering and didn't want him to suffer anymore, or he was pissed off at the guy and wanted to kill him." So I have a difference between first degree murder and second degree murder. First degree murder, that's forever. Second degree murder, you get out.
¶ 38 Contrary to the trial court's findings, we conclude the officers' repeated threats of life imprisonment, accusations of lying, and implications that Popeye was "not going down alone" constitute both implied and explicit threats. See People v. Quintana , 198 Colo. 461, 463, 601 P.2d 350, 351 (1979) (finding confession involuntary where defendant was encouraged to give a statement because it would be easier on his family); Parada , 188 Colo. at 232, 533 P.2d at 1122 (finding implied promise from officers' statements that they were not there to get the defendant in trouble, but only to straighten out whether she was in fact employed); but cf. McIntyre , ¶¶ 19, 33 (finding officer's statement, "Our goal isn't to destroy a life ... [o]ur goal isn't to ruin a life ... [the detective is] all about ... trying to get people the help they need," was not a coercive promise); Zadran , ¶¶ 4,16 (finding that the officer's statements that "I think it would be in your best interest to talk to me," "I think you are going to be interested in some of the things that I already know," and "[y]ou don't have to talk to me" were not coercive promises but instead an attempt to establish rapport); Miranda-Olivas , 41 P.3d at 662 (concluding that accusations of lying were not coercive where officer had reason to believe defendant was actually lying).
¶ 39 Moreover, the use of more than one interrogator, especially during the course of a continuous interrogation, weighs heavily against a finding of voluntariness. See Ashcraft v. Tennessee , 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) ("It is inconceivable that any court of justice in the land ... would permit prosecutors serving in relays to keep a defendant witness under continuous [examination] ... in an effort to extract a 'voluntary' confession."); see also Miranda , 384 U.S. at 456 n.25, 86 S.Ct. 1602 (expressing concern over cases where detectives subjected defendants to "continuous and coercive interrogation").
¶ 40 Additionally, though not mentioned in the court's order, we conclude the officer's statement about meeting with the district attorney to discuss what charges should be levied against Springsted constitutes a promise of leniency amounting to coercion that weighs against a voluntariness finding. See United States v. Lopez , 437 F.3d 1059, 1066 (10th Cir. 2006) (finding federal agents'
*714 promises to defendant that he would spend six rather than sixty years in prison if he admitted to killing the victim by mistake, coupled with the agents' misrepresentations about the strength of evidence against the defendant, rendered the statements involuntary).
¶ 41 We also conclude the officers employed psychological coercion by repeatedly asking Springsted whether he loved his wife and by reminding him he risked losing her forever. They exploited his religious beliefs by rhetorically asking if his religion condoned murder after Springsted had shown them his "101% for god" tattoo. See Zadran , ¶ 17 (exploiting a defendant's particular set of vulnerabilities for the purpose of obtaining inculpatory statements is coercive); People v. Humphrey , 132 P.3d 352, 362 (Colo. 2006) (holding it was coercive psychological pressure where the officer disclosed the victim's death, to which the defendant was particularly vulnerable, and then followed up with suggestive questions). As in Humphrey , the officer followed his religious remarks with the aggressive questioning set forth above.
¶ 42 Finally, we are particularly troubled by the officer's use of a computer voice stress analyzer (CVSA) test near the end of the interview and conclude that under the circumstances here, it was both coercive and intended to elicit a confession rather than the truth. Indeed, as the officer attached wires to Springsted's body, he said he had used the device against insurgents in Iraq[2] and that the military used it to "detect lies" and "to show whether you're telling the truth or being deceptive." He then told Springsted, "If you don't start remembering, you're going to prison for the rest of your life," and "You should say why you did it." Immediately before turning on the machine, the officer said,
Here's the problem. You're trying not to talk about it, but everyone else is talking about it. Okay? Popeye, Jennifer, Suzie, Kerry. Yeah. You got a lot riding on you. If you owe Popeye that much, I'm just telling you ain't gotta talk, I'll talk. If you owe Popeye that much, I can guarantee it, when it comes to court, the story will be different. It always does. [sic] I'm giving you an opportunity....
¶ 43 Contrary to the trial court's findings, we conclude the videotape reveals numerous threats, promises, and psychological coercion. Moreover, we are not persuaded by the People's arguments that People v. Mares , 263 P.3d 699 (Colo. App. 2011), requires a different result. Mares involved the interrogation of a witness, not an accused. There, the police told the witness she was free to leave and never advised her of her rights, while here, Springsted was in custody. The witness in Mares was interrogated for less than one hour, while Springsted was interrogated for nearly five hours. The witness had a male companion with her throughout the interview, while Springsted was alone. Finally, the witness was interrogated by one officer, while Springsted was interrogated by two.
¶ 44 We are similarly unpersuaded that People v. Bostic , 148 P.3d 250 (Colo. App. 2006), requires a different result. In Bostic , the officer made a single remark that the defendant "should probably be cooperative, if at all possible" as the two sat in a patrol car. Id. at 257. In contrast, Springsted's lengthy and confrontational interrogation was filled with accusations and threats. Thus, the length of the interview and the use of multiple officers weigh against a finding of voluntariness. See Medina , 25 P.3d at 1226 (stating that the duration of interrogations is relevant because coercive conduct may, over time, pressure a defendant into confessing).
¶ 45 Finally, People v. Blessett , 155 P.3d 388 (Colo. App. 2006), does not require a different result. Unlike Springsted's interrogation, the questioning in Blessett was not accusatory, the interview lasted less than one hour, and the defendant had prior experience in the criminal justice system.
¶ 46 Having concluded the officers' conduct "created an atmosphere of unconstitutional coercion," we must now determine whether Springsted made inculpatory statements and whether the officers' coercive conduct played a significant role in inducing them. Ramadon , ¶ 16.
*715 ¶ 47 First, we note that when coercion produces a series of statements, we need not parse and dissect each statement to determine which ones are inculpatory and which are not. Id. at ¶ 21. Rather, we review the entire interrogation from the point at which coercion occurs, applying the totality of the circumstances test. Id. at ¶ 22.
¶ 48 Our review of the videotape reveals the existence of a coercive atmosphere from the time the interview began, as illustrated by the above quotations. While we agree with the trial court that Springsted could not recall many of the details the officers sought to elicit from him, we disagree that Springsted never changed his story and never made incriminating statements. During this interview, Springsted departed from his prior statement that he could not remember. Instead, the videotape reveals that Springsted admitted he possibly shot the victim. He admitted that he used the .45 caliber gun and that Popeye used the .50 caliber gun to shoot the victim. He said the victim was shot from behind and agreed that the chest shooting was "to put the victim out of his misery." He explained that he did not want to hurt anyone, which was the reason he served as a mechanic in the Army. And, Springsted admitted that gunshot residue from the .45 caliber gun would be found on his hands. These statements placed Springsted at the shooting and provided evidence, at a minimum, that he was an accomplice to the crimes, even if he did not personally admit his involvement. See id. at ¶ 29.
¶ 49 The focus of voluntariness is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined-a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." Rogers , 365 U.S. at 544, 81 S.Ct. 735. Considering the length of the interrogation, the participation of two officers, the repeated threats of prison and isolation from family, the repeated promises that it would be better (less punitive) if Springsted personally admitted to the shooting, the exploitation of Springsted's religious beliefs, and the officer's characterization of the CVSA machine as infallible, we conclude the police conduct created an unconstitutionally coercive atmosphere that induced Springsted's inculpatory statements. Accordingly, we find his statements from this interview were made involuntarily and that they should have been suppressed.
4. Fourth Interview
¶ 50 The next day, officers arrested Springsted and took him to jail for the final two interviews. The interviewing officer advised Springsted he had failed the CVSA test, saying, "You failed; it showed deception, okay? It's been around since the 70s; machines don't lie, people do. I just want you to come in here and tell the truth.... Proven equipment. Militaries used it. Thirty years. People lie; it doesn't. Okay?"
¶ 51 The officers' coercive conduct from the third interview was repeated in the fourth, including the following statements:
• I want you to look at me, and I want you to man up, and I want you to tell me what happened. Okay? Because all of your friends are telling us what happened.
• Well, I talked to your family today, including your wife, and I got what I needed. Because your family is not going to jail for you. I'm just telling you shot him twice. Okay? Multiple people heard you [say] "Yeah, I shot him twice."
• You're going to have the rest of your life to try and remember, okay? For popping two rounds into Chopps. That's a long time. Because when I get to court, I'm going to prove by these text messages that you knew.
• I know you're lying. I know what happened; I know what the evidence is telling me. Okay?
• So how long is it going to take from now until court 'til you go to prison for the rest of your life until you remember exactly what happened?
• It's like I told you before, it looks better if you come in and are truthful about what happened, okay?
*716 • I guess you're Christian ... must be 101% for Christ, right?.... But you are not living by that, right?.... Shooting people in the chest isn't living for Christ.
• Now I don't know what God you worship, but mine? That ain't right. No compassion, no compassion. No remorse. None whatsoever. None. I've dealt with some hard fucking people, I have over the last eighteen years, and I can't believe you have no remorse for what you did to that poor fucking kid. Popeye? I expect it from him. You're thirty-two years old. You're gonna prove yourself to some old fucking man by shooting this man in the chest because he's twitching after his brains are blown out, really? No remorse. But you claim you're a Christian. God-fearing man. 101%ers of Christ. Right? Bullshit. Pray for forgiveness. You better pray for forgiveness.
¶ 52 Additionally, the officer showed Springsted sexually explicit text messages between Varnadore and Springsted's wife revealing a lengthy affair about which Springsted was unaware. The messages included his wife's statement that she had no regrets about the affair. Springsted was visibly upset by this revelation.
¶ 53 As with the third interview, we conclude, under the totality of the circumstances, that the officer's conduct was psychologically coercive because it exploited Springsted's vulnerabilities for the purpose of obtaining inculpatory statements. Zadran , ¶ 17; Ramadon , ¶ 28. We further conclude that the coercive conduct induced inculpatory statements. The officer said, "It is like I have told you before, it looks a lot better if you come in and are truthful about what happened tell it like what it was, wrong place at the wrong time, accident...." Springsted acquiesced and admitted, "Well that is pretty much what it was. I was at the wrong place at the wrong time," and "I knew Popeye wanted to talk to him [Chopps]." Indeed, when an officer's statements suggest a narrative and require agreement, a defendant's subsequent acquiescence to those suggestions constitutes strong evidence that his will has been overborne. Effland , 240 P.3d at 879. Accordingly, Springsted's statements from this interview were involuntary.
5. Fifth Interview
¶ 54 Because we have concluded that the inculpatory statements Springsted made during the fourth interview were the product of police coercion, and because the fifth interview occurred within eleven minutes of the fourth, we must determine whether the fifth interview was tainted by the coercion in the fourth. For the following reasons, we conclude that it was.
¶ 55 Although an earlier coerced confession does not necessarily undermine the voluntary character of subsequent confessions, see Oregon v. Elstad , 470 U.S. 298, 310-12, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), courts have an obligation to ensure that interrogating officers who receive such later confessions were not merely "the beneficiaries of the pressure" earlier applied that improperly led to the first confession. Westover v. United States , decided together with Miranda , 384 U.S. at 497, 86 S.Ct. 1602. To assess whether the coercion of an earlier confession infected a subsequent confession, a court must look to all attendant circumstances. People v. Vigil , 242 P.3d 1092, 1096-97 (Colo. 2010). "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Elstad , 470 U.S. at 310, 105 S.Ct. 1285.
¶ 56 To establish that a second confession was not tainted by the first, "[t]he government must show intervening circumstances which indicate that the second confession was 'insulate[d] ... from the effect of all that went before.' " United States v. Perdue , 8 F.3d 1455, 1467 (10th Cir. 1993) (quoting Clewis v. Texas , 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) ). The later confession will be admissible "only if such a distinction is justified by a sufficiently isolating break in the stream of events." Id. at 1467-68 (citation omitted).
*717 ¶ 57 In Vigil , the court found the defendant's second interrogation was infected by the coercive pressures of the first interrogation because the same officers who threatened physical force against the defendant in the first interrogation conducted the second interrogation. 242 P.3d at 1097. The court reasoned that even though the defendant received medical treatment at a hospital between the two interrogations, the coercive pressures from the first interrogation remained because the second interrogation occurred immediately following the defendant's release from the hospital. Id. Thus, the coercive pressures remained and the officers in the second interrogation were the beneficiaries of the lingering effects of the prior coercion.
¶ 58 Likewise, in Lopez , the Tenth Circuit held that when the officer misrepresented the strength of the evidence against the defendant and promised leniency to elicit inculpatory statements, the coercive pressures of a first interrogation remained twelve hours later in a subsequent interrogation. 437 F.3d at 1066. Critically, in both Lopez and Vigil , there were no intervening circumstances that created a break in the "stream of events." Perdue , 8 F.3d at 1468 (citation omitted).
¶ 59 Here, it is clear that in the eleven minutes between the fourth and fifth interviews, there was no "break in the stream of events" that alleviated the coercive pressures of the fourth interview. Springsted's fourth interview ended with the officer's repeated statements, "You better pray for forgiveness." At the conclusion of the fourth interview, and in contrast to all previous occasions, Springsted remained in custody and at the police station. Almost immediately thereafter, a different officer said, "I can tell you, you haven't told us everything. Do you want to talk to me some more?" Minutes later, Springsted was back in the interview room making inculpatory statements.[3]
¶ 60 While in some circumstances the presence of a different officer may alleviate some of the coercive pressures of an earlier interview, we find that the last officer's questioning, which was non-threatening and encouraging, did not do so here. See Perdue , at 1469 (finding that a change in officers did not break the chain of events or reduce the coercive pressures from the first interrogation); cf. Vigil , 242 P.3d at 1096-97 (finding that having the same officers in a subsequent interrogation allows the coercion from the first interrogation to linger).
¶ 61 Indeed, the officers from the fourth and fifth interviews conducted them in the same room, and the time between them was brief. There were no intervening circumstances. Thus, as in Vigil , the coercive pressures of the prior threats and promises of leniency remained, as did the psychological pressures of being a "good Christian" and being betrayed by a spouse. While we agree with the trial court's finding that the last officer did not employ any coercive tactics or make any threats, we also conclude that he was the beneficiary of the coercion from the fourth interview. And, unlike in prior interviews, Springsted described the shooting in a more narrative fashion, providing details about how the victim's face looked, where he was standing, how he grabbed the gun with his right hand, and how horrible he felt. Thus, we conclude the officer's coercive conduct from the fourth interview tainted the fifth interview by inducing further inculpatory statements and that those statements were involuntary.
¶ 62 Accordingly, considering the totality of the circumstances, we conclude that Springsted's statements from the first two interviews are voluntary and admissible at trial. However, we conclude that the coercive atmosphere of the remaining interviews, coupled with the factors set forth above, rendered Springsted's statements in the remaining interviews involuntary and that those statements should have been suppressed.
III. Harmless Error
¶ 63 Having concluded that Springsted's statements in the last three interviews were not voluntary, we must now determine *718 whether their admission was nevertheless harmless in light of all the evidence presented. In doing so, we must decide whether their admission was constitutionally harmless. See People v. Boykins , 140 P.3d 87, 94 (Colo. App. 2005) (stating that admission of an involuntary confession is reviewed for constitutional harmless error).
¶ 64 A constitutional harmless error analysis differs from a general harmless error analysis. People v. Welsh , 58 P.3d 1065, 1072 (Colo. App. 2002). Under a harmless error standard, reversal is required only if the error affects the substantial rights of the defendant. Id. Under a constitutional harmless error standard, however, reversal is required unless the court is confident beyond a reasonable doubt that the error did not contribute to the guilty verdict. Id.
¶ 65 An error is not harmless if there is a reasonable possibility that the error contributed to the defendant's conviction by substantially influencing the verdict or affecting the fairness of the proceedings. Hagos , ¶ 11. The question, then, is not "whether a guilty verdict would have been rendered in a trial without the error, but what effect the error had on this verdict." Raile v. People , 148 P.3d 126, 133 (Colo. 2006). The People have the burden of showing that a constitutional error was harmless beyond a reasonable doubt. Hagos , ¶ 11.
¶ 66 In considering whether an error is harmless beyond a reasonable doubt, we consider the entire record and review several factors, including the overall strength of the prosecution's case, the importance of the evidence to the prosecution's case, the impact of the improperly admitted evidence on the jury, and whether the evidence was cumulative. See Merritt v. People , 842 P.2d 162, 169 (Colo. 1992) ; People v. Casias , 2012 COA 117, ¶ 64, 312 P.3d 208. Thus, a reviewing court must look at the trial as a whole and decide whether there is a reasonable possibility that the defendant could have been prejudiced by the error. See Welsh , 58 P.3d at 1072.
A. Trial Evidence and Argument
¶ 67 The prosecution admitted redacted versions of the third and fifth interviews. Therefore, the jury heard Springsted's conflicting statements that he was downstairs when the victim was shot, and that he possibly shot the victim. It heard him say he shot the victim with the .45 caliber gun and that Popeye used a .50 caliber gun.
¶ 68 The jury also heard Springsted's conflicting statements that he did not remember shooting the victim, and that he shot the victim to put him out of his misery. It heard him describe shooting the victim and placing the casings in the trash can. It heard him admit that gunshot residue from the .45 caliber gun would be on him, and that he was with Popeye when Popeye sent numerous texts to the victim inviting him to the house.
¶ 69 Finally, the jury heard Springsted admit in the interviews that he fired two shots and that he reached over the microwave when doing so. When confronted with the impossibility of reaching over the microwave, Springsted changed his explanation and said he shot the victim while standing over him. When asked how it made him feel, Springsted said he felt "fucking horrible" and that he had never hurt anyone in his life.
¶ 70 In its first closing, the prosecution argued that the text messages and calls established that the victim was lured to Popeye's house. It then argued that Springsted's statements to the police, and in particular his statement to the last officer, showed in his "own words" that he shot the victim in the chest. It concluded by arguing that the autopsy report containing the coroner's conclusion that the shots to the chest were fired "straight down" was "just like [Springsted] said he did it" to the last officer.
¶ 71 Similarly, in rebuttal closing, the prosecution invited the jury to review the videotaped statements and said, "You have a lot of credible evidence here that points directly to this defendant, including his own statement."
B. Analysis
¶ 72 The People argue that these combined statements do not constitute a *719 "confession" and, thus, their admission was harmless. They further argue that the record contains overwhelming evidence of Springsted's guilt because Springsted's friends told police that he admitted firing the last two shots. For the reasons stated below, we disagree and conclude that when the statements are viewed in light of the remaining trial evidence, there is a reasonable possibility that they contributed to Springsted's convictions. See People v. Carter , 2015 COA 36, ¶ 47, 414 P.3d 15 (cert. granted in part Jan. 25, 2016).
¶ 73 The trial evidence implicating Springsted as the second shooter included the video statements, the coroner's opinion that whoever fired the chest shots was standing over the victim at the time the gun was fired, and the testimony of two witnesses-Kerry Brodeur and Michael Sabo-who rode home in a car with Varnadore and Springsted after the first interview.
¶ 74 Brodeur testified that on the day of the killing, she rode home from the sheriff's station with Varnadore, Springsted, and Sabo, and that while Springsted remained silent, Varnadore discussed what happened at Popeye's house.
Nathan [Varnadore] said that Chopps came through the garage door into the house, shook his hand, shook Brian's hand ... and walked towards Popeye, started arguing with Popeye, made the comment that he was gonna shoot that one-eyed-what that reads and he-Nathan said the he jumped in front of Popeye because it looked like Chopps was gonna attack Popeye. Popeye grabbed his gun. Popeye laid his gun on Nathan's shoulder and shot Chopps in the face. That's what Nathan said in the car.
¶ 75 The prosecution then impeached Brodeur with her original statement to the police in which she attributed the above statements to Springsted rather than to Varnadore. Brodeur explained that when she originally told the police Springsted had made no statements, the police "took [her] into another room and told [her] that if [she] did not tell them that [Springsted] said that he shot [Chopps], that [she] was in a conspiracy with them." She said she lied to the police because "the sheriffs told me they thought it was Brian that shot him, and they weren't about to let me out of that room until I told them Brian shot him."
¶ 76 Sabo testified that the only thing he recalled hearing in the car was something about a mercy killing, and that he could not recall who made the statement. Springsted said he was beside the trash can when the shooting happened and then blacked out. For the remainder of the ride, Sabo said Springsted remained silent and stared out the window.
¶ 77 When the prosecution impeached Sabo with his original statement to the police, he explained,
The detective had told me that [Brodeur] had told the detective that [Springsted] told her, that ... he had fired the weapon, meaning [Springsted] fired the weapon. This is what the detective told me. ... So, therefore, if [Brodeur] said [Springsted] pulled the triggers, then, I guess, [Springsted] pulled the triggers is exactly what I told the detective.
¶ 78 We do not view this witness testimony as overwhelming evidence of guilt, but rather as conflicting statements of witnesses who were not present when the shooting occurred. Contradicting this evidence was the testimony of another prosecution witness, Steve Kressin, who visited Popeye's house hours before the shooting. Kressin testified that when he visited Popeye the morning of the shooting, Popeye said "[h]e wanted to kill [Chopps]. He wanted to shoot him once in the head and twice in the chest." Kressin did not say Springsted was part of this plan. Moreover, Kressin's testimony is consistent with the victim's injuries and with the physical evidence that the gun used for the shot to the victim's face jammed and was only fired once.
¶ 79 Although not discussed in the People's brief, we note that the prosecution relied heavily on numerous phone calls and text messages in the hours before and immediately after the shooting to argue that Springsted and Popeye lured the victim to Popeye's house. After a thorough review of the admitted texts and calls, we note that there are no *720 calls or text messages between Springsted and the victim. While the calls and texts suggest that Springsted, Varnadore, and Sabo planned to meet at Popeye's house the morning of May 3, and that they expected the victim to arrive as well, nothing in them suggests that Springsted lured the victim to Popeye's house or that he shot the victim in the chest. Indeed, they may suggest that Springsted actually planned to spend the day helping a friend [Doc] move. This, however, is a determination for the jury to make and not this court. See Clark v. People , 232 P.3d 1287, 1293 (Colo. 2010) (reviewing court may not sit as thirteenth juror and determine weight of evidence presented to the jury).
¶ 80 Finally, the physical evidence showed that Popeye shot the victim and did not link Springsted to the victim or a particular gun. The victim's blood was recovered from Popeye's vest and jeans, while all of Springsted's clothing tested negative for blood. Further, no DNA or fingerprint evidence linked Springsted to either gun. And, consistent with Springsted's contention that he was in the basement and dropped his phone there, the responding officer described him coming from the basement as she walked into the house, and police later recovered Springsted's phone presumably from the basement since no contrary evidence was introduced.
¶ 81 In sum, we conclude that the bulk of the evidence produced at trial proved that Popeye was the shooter and that the evidence was not overwhelming as to Springsted, thereby rendering his statements to the police particularly significant. Indeed, their importance is evident from the prosecution's closing arguments and the absence of physical evidence linking Springsted to the shooting. Accordingly, we conclude there is a reasonable possibility that the error in this case contributed to Springsted's conviction by substantially influencing the verdict or affecting the fairness of the proceedings. We therefore conclude that the reversal of Springsted's convictions is required.
IV. Conclusion
¶ 82 The judgments of conviction for first degree murder, conspiracy to commit first degree murder, and crime of violence are reversed, and the case is remanded for a new trial. On retrial, Springsted's statements from the third, fourth, and fifth interviews should not be admitted for any purpose.
JUDGE ROMÁN and JUDGE LICHTENSTEIN concur.

We acknowledge that "[c]ourts have consistently upheld the integrity of Miranda warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation," including interrogations conducted by two separate officers. People v. Blessett , 155 P.3d 388, 396 (Colo. App. 2006). Thus, we only note the failure to re-advise as relevant to Springsted's awareness of his situation. See People v. Blankenship , 30 P.3d 698, 703-04 (Colo. App. 2000) (finding prior involvement with the criminal procedure relevant to voluntariness determination).

The officer admitted this was not true during the motions hearing.

We note that the videotape of the fifth interview is incomplete and begins while the interview is in progress.